PRESERVE THE DUNES, INC v DEPARTMENT OF
ENVIRONMENTAL QUALITY

Docket No. 231728. Submitted April 10, 2002, at Grand Rapids. Decided
October 4, 2002, at 9:00 A.M. Leave to appeal sought.

Preserve the Dunes, Inc., brought an action under the Michigan Environmental Protection Act, MCL 324.1701 *et seq.*, in the Berrien Circuit Court against the Department of Environmental Quality and TechniSand, Inc., seeking declaratory and injunctive relief against the DEQ's issuance to TechniSand of an amended permit that allows TechniSand to expand a sand mining operation into a critical dune area. The original permit, which was transferred to TechniSand in 1992 in a sale of the site containing adjoining critical and noncritical dune areas, had allowed TechniSand to mine only in the noncritical dune area. The plaintiff alleged that the DEQ violated the MEPA by issuing the amended permit because mining in the critical dune area will result in the loss of the critical dune area (a unique, irreplaceable, and fragile natural resource) and will adversely affect the habitat of threatened species. The plaintiff also alleged that the DEQ violated the MEPA by issuing the amended permit in contravention of subsection 35302(c) of the sand dune protection and management act (SDPMA), MCL 324.35302(c), which states that the benefits from alteration or use of a critical dune area "shall occur only when the protection of the environment and the ecology of the critical dune areas for the benefit of the present and future generations is assured." The plaintiff further alleged that the DEQ was without legal authority to issue the amended permit because the exceptions contained in subsection 63702(1) of the sand dune mining act (SDMA), MCL 324.63702(1), to the otherwise total prohibition against mining in critical dune areas do not apply. MCL 324.63702(1) provides that the DEQ shall not issue a sand dune mining permit within a critical dune area after July 5, 1989, except when (a) the operator seeks to renew or amend a sand dune mining permit that was issued before July 5, 1989, or (b) the operator holds a sand dune mining permit issued pursuant to MCL 324.63704 and is seeking to amend the mining permit to include land that is adjacent to the property the operator is permitted to mine and before July 5, 1989, the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an

amended permit. The plaintiff moved for summary disposition with respect to its claims that the DEQ lacked legal authority to issue the amended mining permit and that TechniSand did not qualify under either exception of the SDMA to the prohibition of mining in critical dune areas. The court, Scott Schofield, J., denied the motion, ruling that the claims were time-barred and, even if they were not, TechniSand qualified for the amended permit under the exception provided in MCL 324.63702(1)(b). A bench trial regarding the plaintiff's claim that issuance of the amended mining permit would damage the environment as prohibited by the MEPA resulted in the entry of a judgment of no cause of action. The court, Paul Maloney, J., found that although the plaintiff had established a prima facie case under the MEPA, the defendants had rebutted the prima facie showing by establishing that "any adverse impact on natural resources" that would result from mining in the critical dune area would not rise to the level of impairment or destruction of natural resources within the meaning of the MEPA. The plaintiff appealed.

The Court of Appeals *held*:

1. The MEPA provides that any person may maintain in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur an action for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. The MEPA calls for a court to determine what the applicable environmental standard of procedure is in light of the particular circumstances of a case and in light of the nature of the natural resource to be protected. If the court finds that the applicable standard does not provide sufficient environmental protection or does not prevent likely or actual environmental harm, the court may specify a different, stricter standard. The standard to be used as a basis for determining a violation of the MEPA under the present circumstances involving mining in a critical dune area is found within the SDMA. Thus, when a party seeks to mine in a critical dune area, it must first fall within one of the exceptions set forth in MCL 324.63702. It is only after MCL 324.63702 is satisfied that the party must also satisfy the general requirements of MCL 324.63704 and MCL 324.63709. If MCL 324.63702 is not satisfied, mining in a critical dune area is prohibited and further analysis of MCL 324.63704 and MCL 324.63709 is unnecessary.

2. The plaintiff's claim challenging the DEQ's authority to allow TechniSand to mine in a critical dune area and challenging Technisand's qualifications under MCL 324.63702 is not time-barred. An action under the MEPA is subject to no statute of limitations. The

SDMA, which provides the standard to be applied in this MEPA action, provides for no time limitation.

3. TechniSand does not qualify under either exception set forth by MCL 324.63702(1)(a) and (b) to the prohibition of mining in a critical dune area. Subsections a and b must be read together because of their juxtaposition. A reasonable reading of the subsections is that subsection a applies to the amendment or renewal of a permit that already allows mining in a defined area, while subsection b applies when the permit holder seeks to expand the permit to include adjacent land that contains a critical dune area and that it owned before July 5, 1989. Subsection a does not apply to this case because its application would render subsection b superfluous. TechniSand does not qualify under subsection b because TechniSand did not own the critical dune area on July 5, 1989.

Reversed and remanded for entry of summary disposition in favor of the plaintiff.

MINES AND MINERALS — SAND DUNE MINING — CRITICAL DUNE AREAS — PERMITS — MICHIGAN ENVIRONMENTAL PROTECTION ACT.

The issuance by the Department of Environmental Quality of a sand mining permit allowing mining in a critical dune area may be challenged in an action for declaratory and injunctive relief pursuant to the Michigan Environmental Protection Act relative to compliance with the requirements of the sand dune mining act; such an action is not subject to any period of limitation and need not be preceded by the exhaustion of administrative remedies (MCL 324.1701 *et seq.*, 324.63702).

*Taglia, Fette, Dumke, Passaro & Kahne, P.C.* (by *Thomas R. Fette*), *Beier Howlett, P.C.* (by *Jeffrey K. Haynes*), and *Neal, Gerber & Eisenberg* (by *Phil C. Neal* and *Maria J. Minor*), for Preserve the Dunes, Inc.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *James R. Piggush*, Assistant Attorney General, for the Department of Environmental Quality.

*Howard & Howard Attorneys, P.C.* (by *James H. Geary*), for TechniSand, Inc.

Before: OWENS, P.J., and MARKEY and MURRAY, JJ.

MARKEY, J. Plaintiff, Preserve the Dunes, Inc., appeals by right the trial court's order granting partial summary disposition in favor of defendants Department of Environmental Quality and TechniSand, Inc., and the court's order of no cause of action in favor of defendants following a bench trial. In this lawsuit, plaintiff challenges the DEQ's issuance of an amended permit that allows TechniSand to expand noncritical sand dune mining into a critical dune area adjacent to its noncritical sand mining operation. We reverse and remand.

### I. FACTS AND PROCEDURAL HISTORY

Plaintiff, an ad hoc group of local citizens organized for the purpose of this lawsuit, filed this lawsuit in July 1998, under the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq.*, challenging an amended permit issued by the DEQ in November 1996, which allowed TechniSand to expand a mining operation in a noncritical dune area into an adjacent critical dune area. The land at issue is a sand dune area in Berrien County. That area consists of seventy-one acres of a critical dune area within 126.5 acres of a sand dune. The critical dune area, containing two to three million tons of sand, is on private property approximately one mile inland from Lake Michigan. It is the only critical sand dune area containing elevated dunes east of Interstate Highway 196, which runs along the area's western border. TechniSand is a major supplier of industrial sand and the largest supplier of industrial sand to the foundries of the automobile industry.

Defendant TechniSand incorporated in the state of Delaware on July 12, 1991. On July 31, 1991, TechniSand purchased the "Nadeau Site" property from Manley Brothers of Indiana, Inc. The land deeded to TechniSand from Manley Brothers was part of a much larger transaction in which Fairmont Minerals, Ltd., of Chardon, Ohio, acquired most of the assets belonging to Hepworth Minerals and Chemicals, Inc., of Chesterton, Indiana—a subsidiary of Hepworth PLC of Sheffield, England. TechniSand is a wholly owned subsidiary of Fairmont Minerals, formed in order to acquire some of Hepworth's mining assets. In 1992, Manley's sand mining permit, number TS-NS-107, was transferred to TechniSand as the new owner of the Nadeau Site. TechniSand's original permit allowed the company to mine only noncritical dunes in the eastern parcel of the Nadeau Site.

In 1994, TechniSand applied to the Department of Natural Resources for an amendment of the permit. TechniSand sought permission to mine about 126.5 acres in the western parcel of the Nadeau Site. The proposal to amend the original permit was referred to in various documents as the "Taube Road Expansion" or the "Nadeau Site Expansion." TechniSand sought to extend the mining from the noncritical dune area on the eastern parcel of the site to the critical dune area, and to remove seven million tons of sand from surface operations and 950,000 tons of sand from subsurface operations on 70.45 acres of the 126.5-acre site, and proposed to create two lakes of 9.8 and 13.7 acres respectively and to relocate threatened species of flora.

The record indicates that when TechniSand first sought the amended permit to mine the adjacent

Nadeau Site, it did so on the theory that it qualified under MCL 324.63702(1)(b), an exception to the prohibition against issuing permits for mining in critical dune areas. TechniSand's theory was that it was a permit holder seeking to expand mining operations onto adjacent property, which is essentially the description of who is entitled to the statutory exception. According to that provision, in order to qualify for the exception, the operator seeking the amended permit must have owned before July 5, 1989, the land or the rights to mine dune sand in the land for which the permit is sought. On April 20, 1995, the DNR denied Techni-Sand's application for an amended permit, explaining that TechniSand was not eligible under the exception from the statutory prohibition against mining in critical sand dune areas because it acquired the property it sought to mine after July 5, 1989.

In October 1995, the Governor issued Executive Order No. 1995-18 creating the DEQ and transferring environmental regulatory authority from the DNR to the DEQ. In April 1996, the DEQ sent TechniSand a letter indicating that since 1995 there had been "many changes in State government" and that those changes, coupled with "additional information that TechniSand has apparently supplied to the Michigan Attorney General's office," were instrumental in the government's ability to proceed to review the amendment request. The DEQ letter requested that TechniSand submit modifications to its environmental impact statement (EIS) and its progressive cell-unit mining and reclamation plan in order to "expedite" the processing of the amended mining permit application. The record does not indicate what specific changes in government prompted the DEQ to invite TechniSand to

amend and resubmit its application, nor does it indicate what "additional information" TechniSand had "apparently" supplied.

TechniSand amended its application and resubmitted the documents to the DEQ in May 1996. The EIS that was submitted contained a list of "unavoidable adverse impacts" and acknowledged that the proposed expansion of mining operations would significantly impair the environment and would permanently destroy a critical dune. Without explanation regarding under which exception of MCL 324.63702 TechniSand qualified, the DEQ issued to TechniSand an amended permit to mine in the critical dune area in the Nadeau Site in November 1996.

Several underlying facts are undisputed. Those include the fact that critical dune areas are a natural resource, that sand is a natural resource, and that the critical dune area that is the subject of this litigation has been designated for protection under various environmental statutes since 1978. It was first designated as such under the sand dune protection and management act (SDPMA) by Administrative Rule 281.402 adopted by the DNR on August 17, 1978, as one of thirteen sand dune areas designated. The area was designated a barrier dune under the SDPMA in the DNR publication of *Barrier Dune Formation Areas, 1979-1981*. The DNR's Land and Water Management Division identified the critical dune area in the *Atlas of Critical Dunes*. The Legislature adopted the *Atlas of Critical Dunes*. The DEQ Geological Survey Division also identified the critical dune area in its publication of *Designated and Critical Sand Dune Areas* in April 1996. It remains a critical dune area today.

The critical dune area at issue is seventy-five feet in height, has a steep inland east-facing slope, and is part of a larger critical dune area. Interstate 196, which does not affect the status of the critical dune area, sits atop the dunes, separating two portions of the critical dune area. There are about two to three million tons of sand in the critical dune area. The amended permit issued to TechniSand allows it to obliterate almost all the critical dune area; only a small portion of the critical dune area will remain if the mining proceeds as planned, and that remaining portion is part of the northeast end of the critical dune area within a conservation easement.

Plaintiff, in its first amended complaint for declaratory and injunctive relief, alleged that under MCL 324.1701 *et seq.* (MEPA), MCL 324.63701 *et seq.* (the sand dune mining act [SDMA]), and MCL 324.35301 *et seq.* (the SDPMA), the DEQ violated the MEPA by issuing the amended permit to TechniSand because mining in the critical Taube Road Expansion area of the Nadeau Site will destroy a unique, irreplaceable, and fragile natural resource of this state. The mining will alter the physical, biological, and geological characteristics of the site, a critical dune will be lost, and topsoil and vegetation will be removed. The dune's flora and fauna habitat, including the habitat of two species listed as threatened by the state of Michigan, and the aesthetic quality of the property will be affected because a large percentage of the critical dune will be removed, forever changing the most dominant physical attribute of this site. In addition, plaintiff alleged that the DEQ violated the MEPA by issuing the amended permit in contravention of the legislative mandate within MCL 324.35302(c) that states

that the benefits from alteration or use of a critical dune area "shall occur only when the protection of the environment and the ecology of the critical dune areas for the benefit of the present and future generations is assured." Plaintiff further alleged that the DEQ was without legal authority to issue the amended permit because the exceptions contained in MCL 324.63702(1) of the SDMA to the otherwise total prohibition against mining in critical dune areas do not apply. Plaintiff asked the court to enjoin the DEQ, to require the DEQ to rescind the amended permit, and to enjoin TechniSand from mining the critical dune area in the Nadeau Site.

Both defendants subsequently moved for summary disposition, asserting that plaintiff had failed to state a claim for relief under the MEPA and that plaintiff's lawsuit was untimely because it was required to challenge the disputed amendment of the permit within twenty-one days as required by the Revised Judicature Act (RJA), MCL 600.631, and MCR 7.104(A). At a hearing on defendants' summary disposition motions, Berrien Circuit Judge David Peterson denied defendants' motion, finding that plaintiff's lawsuit was not time-barred and that the MEPA provided an independent cause of action.

Subsequently, plaintiff moved for summary disposition, asserting that the DEQ lacked the legal authority to issue the amended mining permit to TechniSand and that TechniSand did not qualify under either of the two exceptions to the prohibition of mining in critical dune areas found in MCL 324.63702(1) of the SDMA. At a hearing on plaintiff's motion, Berrien Circuit Judge Scott Schofield presided, replacing Judge David Peterson, who had retired. Judge Schofield

ruled, contrary to Judge Peterson's ruling, that the portion of plaintiff's lawsuit that challenged the issuance of the permit was time-barred. On "issues involving the administrative proceedings involving the granting of the permit," Judge Schofield held that the MEPA does not allow for an "unlimited time period" for procedural challenges to administrative actions that affect the environment and that it was

> too late now to argue about whether the [DEQ] had authority under the statute to allow an operator to extend mining from a noncritical dune area to an adjacent critical dune area or whether the [DEQ] had authority under the statute to grant a permit to Defendant even though it was not the operator with a permit to mine an adjacent site on July 5, 1989.

In addition, Judge Schofield found that even if plaintiff's suit were timely, plaintiff's challenges to the administrative action were not well founded. Judge Schofield stated that it was important that the exception "uses the word operator instead of the word person in phrasing the exception" and held that MCL 324.63702(1)(b) was meant to "grandfather in operations, not operators." Judge Schofield further found that plaintiff nonetheless had successfully stated a cause of action under the MEPA and that plaintiff's surviving cause of action was independent from "any administrative appeal rights." Alternatively, Judge Schofield ruled that defendant TechniSand qualified for the amended permit to mine in the critical dune area pursuant to MCL 324.63702(1)(b), but not under 1(a); thus, the DEQ was authorized to issue TechniSand the amended permit. This Court denied plaintiff's application for leave for an interlocutory appeal of Judge Schofield's order.

Berrien Circuit Judge Paul Maloney presided over the six-day trial on plaintiff's claim that issuance of the permit was an administrative action that would damage the environment as prohibited by the MEPA. On November 30, 2000, Judge Maloney issued a decision in which he concluded that plaintiff had established a prima facie case under the MEPA, but that defendants had rebutted plaintiff's prima facie showing. Judge Maloney detailed findings of fact and summarized the applicable law, including the MEPA, the SDPMA, and the SDMA. In its lengthy decision, the court found that the Legislature contemplated sand dune mining in critical dune areas. In addition, the court applied the factors set forth in *Portage v Kalamazoo Co Rd Comm*, 136 Mich App 276; 355 NW2d 913 (1984), to determine what "natural resources" would be affected. Ultimately, the court found that defendants had "established that any adverse impact on the natural resources which will result from the sand mining will not rise to the level of impairment or destruction of natural resources within the meaning of MEPA." In reaching that conclusion, the trial court noted that the testimony established that the subject seventy-one acres make up only one tenth of one percent of the entire state's 70,000 acres of critical sand dune area. The court validated the DEQ sand mining permit, effectively denying plaintiff's request for injunctive relief. A judgment of no cause of action was entered on December 13, 2000. Plaintiff now appeals by right.

## II. APPLICABLE STANDARD TO BE USED TO RESOLVE THIS MATTER

Judge Schofield granted partial summary disposition to defendants on the issue whether plaintiff

could challenge the DEQ's authority to allow TechniSand to mine in the critical dune area under MCL 324.63702 (operating in conjunction with the MEPA, MCL 324.1701 *et seq.*), ruling that such a challenge was time-barred. Alternatively, Judge Schofield ruled that defendant TechniSand qualified for the amended permit to mine in the critical dune area pursuant to MCL 324.63702(1)(b), but not under 1(a), and thus, the DEQ was authorized to issue TechniSand the amended permit.

We must first determine the appropriate standard by which to evaluate plaintiff's claim. The statutory acts that are relevant to the resolution of plaintiff's issues are the MEPA, MCL 324.1701 *et seq.*, the SDMA, MCL 324.63701 *et seq.*, and the SDPMA, MCL 324.35301 *et seq.* An understanding of the MEPA's unique relationship to other environmental statutes is necessary for the resolution of this matter. The MEPA does not act alone, but rather calls for individual courts to determine what the applicable environmental standard or procedure is in light of the particular circumstances of the case and in light of the nature of the natural resource to be protected. It also requires courts to determine which existing environmental laws and standards apply, and whether they are sufficient to protect the natural resource at stake from potential destruction or impairment. In a sense, the MEPA provides an umbrella of environmental protection to be superimposed over more specific environmental statutes—a template that allows private citizens to bring causes of action based on statutes that do not, in and of themselves, provide avenues of relief in civil lawsuits.

The MEPA is part 17 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.1701 *et seq.* MCL 324.1701 provides:

> (1) The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.
>
> (2) In granting relief provided by subsection (1), if there is *a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise,* by the state or an instrumentality, agency, or political subdivision of the state, the court may:
>
> (a) Determine the validity, applicability, and reasonableness of the standard.
>
> (b) If a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court. [Emphasis added.]

Recently, this Court explained the MEPA's role and purpose in *Genesco, Inc v Michigan Dep't of Environmental Quality*, 250 Mich App 45; 645 NW2d 319 (2002). In the context of deciding whether a circuit court has subject-matter jurisdiction to conduct preenforcement review of a "response activity selected or approved" by the DEQ within the ambit of part 201, MCL 324.20101 *et seq.*, the state's version of the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC 9601 *et seq.* (CERCLA), this Court explained that the "approach of part 17 is to preserve the environment through the obtaining of declaratory and injunctive relief in court." *Genesco, supra* at 49. Citing *City of Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 487;

608 NW2d 531 (2000), and MCL 324.1703(1), this Court explained that

> Part 17 permits any person to seek declaratory and injunctive relief, MCL 324.1701(1), on "a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources . . . ." [*Genesco, supra* at 49-50.]

In addition, this Court reiterated the rule that the MEPA "provides a *direct* method for enforcing environmental regulations and challenging *an administrative agency's decision without exhausting administrative remedies*." *Id.* at 50 (emphasis added). Further, this Court stated that the MEPA is "expressly supplementary to other administrative and regulatory procedures provided by law." *Id.* Thus, an administrative agency's decision may be challenged directly under the MEPA. It is unnecessary for a party to exhaust administrative remedies before seeking relief under the MEPA.

Plaintiff argues that the appropriate standard to be applied in the present case is found in MCL 324.63702 of the SDMA, which provides:

> (1) Notwithstanding any other provision of this part, the department *shall not* issue a sand dune mining permit within a *critical dune area* as defined in [MCL 324.35301] after July 5, 1989, except under either of the following circumstances:
>
> (a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5, 1989, subject to the criteria and standards applicable to a renewal or amendatory application.
>
> (b) The operator holds a sand dune mining permit issued pursuant to [MCL 324.63704] and is seeking to amend the

mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989 the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an amended permit.

(2) As used in this section, "adjacent" means land that is contiguous with the land for which the operator holds a sand dune mining permit issued pursuant to [MCL 324.63704], provided no land or space, including a highway or road right-of-way, exists between the property on which sand dune mining is authorized and the adjacent land. [Emphasis added.]

In addition, MCL 324.63704 of the SDMA provides:

(1) After July 1, 1977, a person or operator shall not engage in sand dune mining within Great Lakes sand dune areas without first obtaining a permit for that purpose from the department.

(2) Prior to receiving a permit from the department, a person or operator shall submit all of the following:

(a) A permit application on a form provided by the department.

(b) An environmental impact statement of the proposed mining activity as prescribed by section 63705.

(c) A progressive cell-unit mining and reclamation plan for the proposed mining activity as prescribed by section 63706.

(d) A 15-year mining plan as prescribed by section 63707.

Plaintiff interprets these portions of the SDMA together to mean that while mining in noncritical dune areas is permitted, mining in *critical* dune areas is absolutely prohibited *unless* the party seeking the permit falls within an exception under MCL 324.63702. Plaintiff argues that, in contrast, under ordinary circumstances where no critical dune areas are involved, a party is only required to meet the

requirements of MCL 324.63704 and the general "umbrella" standard for the issuance of a mining permit pursuant to MCL 324.63709, which provides:

> The department shall deny a sand dune mining permit if, upon review of the environmental impact statement, it determines that the proposed sand dune mining activity is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in those resources, as provided by part 17.

We agree with plaintiff that MCL 324.63702 is most logically interpreted as a prohibition of mining in critical dune areas with two exceptions. MCL 324.63702 specifically and solely addresses mining permits in critical dune areas; it provides a higher standard and a procedure for issuance of a permit to mine in critical dune areas. Defendant DEQ agrees that MCL 324.63702 provides a stricter standard, but argues that it simply does not apply because it is "in excess of" the requirements of the MEPA. TechniSand argues that plaintiff is time-barred from relying on MCL 324.63702 and then argues that TechniSand nevertheless qualifies under MCL 324.63702.

We believe that the standard to be used as a basis for determining a violation of the MEPA under the present circumstances involving critical dune area mining is found within the SDMA. We conclude that when a party seeks to mine in a critical dune area, it must first fall within one of the exceptions set forth in MCL 324.63702. It is only after MCL 324.63702 is satisfied that the party seeking to mine in a critical dune area must also satisfy the general requirements of MCL 324.63704 and MCL 324.63709. If MCL 324.63702 is not satisfied, then mining in a critical dune area is prohibited, and further analysis of MCL

324.63704 and MCL 324.63709 is unnecessary. In contrast, when a party seeks to mine in a noncritical dune area, it must comply only with the general requirements of MCL 324.63704 and with the umbrella standard for impairment or destruction under MCL 324.63709.

The relationship between the MEPA and other environmental statutes was recently explained in *Nemeth v Abonmarche Development, Inc,* 457 Mich 16; 576 NW2d 641 (1998). The *Nemeth* case provides an example of the MEPA working in conjunction with another, more specific environmental statute. Therein, our Supreme Court held that the appropriate pollution control standard (applied pursuant to the MEPA, MCL 324.1701) that was to be used as a basis for finding a violation of the MEPA was found within the soil conservation, erosion, and sedimentation control act (SESCA), MCL 324.9101 *et seq. Nemeth, supra* at 29. Our Supreme Court stated that the "MEPA does not impose specific requirements or standards." *Id.* at 30. The Supreme Court concluded that this Court had erred by failing to recognize that a violation of the SESCA established a prima facie violation of the MEPA. *Id.* at 36.

In *Nemeth, id.* at 19, the defendant developers had begun construction of a marina, condominium, and hotel project on the shore of Lake Michigan. The development involved stripping vegetation and topsoil from thirty acres of barrier dunes, digging a basin, and moving thousands of cubic yards of earth to the edges of the construction site. *Id.* at 19-20. After completion of this phase of construction, a storm struck, and "wind and water on the exposed dunes carried sand, snow, fly ash, and other sediments" from the

construction site to the surrounding area, burying parcels, destroying window casings, damaging siding, and blowing into the interiors of homes. *Id.* at 20. Nine months later, the plaintiffs sued. The plaintiffs argued that the developers' violations of the SESCA provided evidence sufficient to form a MEPA violation, by polluting, impairing, or destroying air, water, or other natural resources, or by being likely to do so, in contravention of subsection 1703(1). *Nemeth, supra* at 20. The trial court issued a preliminary injunction, and the city employed a soil erosion control officer, who issued a cease and desist order. *Id.* at 20-21. The trial court ruled that the injunction would last until the agency sought the proper permits. The previously issued permits were not valid because they were not supported by an adequate soil erosion control plan; the trial court also granted a permanent injunction. *Id.* at 22-23.

This Court reversed, holding that an injunction based on a violation of the MEPA was not warranted because the defendants' activities did not " 'rise to such a level of impairment or destruction of a natural resource so as to constitute an environmental risk.' " *Id.* at 23. This Court also held that the sand in question, and its location, was not rare, unique, endangered, or of historical significance, was easily replaceable, and its movement would not have any significant consequential effect on other natural resources. *Id.*

In turn, our Supreme Court reversed, finding that the purpose of the SESCA was to prevent environmental harm caused by sedimentation and erosion, and holding that the SESCA provided the appropriate pollu-

tion control standard applicable to the MEPA case. *Id.* at 29.

In explaining how the SESCA provided the applicable standard, the Supreme Court examined the SESCA's definition of "earth change" as "a human-made change in the natural cover or topography of land, including cut and fill activities, which may result in or contribute to soil erosion or sedimentation of the waters of the state. [MCL 324.9101(5); MSA 13A.9101(5).]" *Nemeth, supra* at 25. The Supreme Court also noted that the SESCA prohibited anyone from maintaining a land use of earth change, with one exception that "except in accordance with this part and the rules or with the applicable local ordinance and pursuant to a permit approved by the appropriate county or local enforcing agency. [MCL 324.9112(1); MSA 13A.9112(1).] *"Nemeth, supra* at 26. In addition, the Supreme Court observed that the DNR had promulgated rules governing a unified soil erosion and sedimentation control program, including provisions for review and approval of site plans, land use plans, or permits relating to erosion control and sedimentation control. *Id.*

The Supreme Court opined that landowners and developers who engage in earth changes are required to obtain a permit from the agency and shall submit a soil erosion and sedimentation control plan to be reviewed and approved before applying for a permit. The Supreme Court also observed that "the enforcing agency shall issue a permit for the proposed earth change" only after these requirements and rules were met. *Id.* This Court decided that the defendants in *Nemeth* had the violated the SESCA, but failed to apply the SESCA as the appropriate standard; instead, this

Court simply applied the so-called *Portage*[1] factors. *Nemeth, supra* at 26, 31. Our Supreme Court explained that, while the *Portage* factors may have constituted the appropriate standard for review under the MEPA in the context of determining whether the removal of trees (the natural resource in that case) was sufficient to constitute an environmental risk and require judicial intervention under the MEPA, those same factors did *not* constitute the "standard" under the MEPA, MCL 324.1701, applicable under the circumstances in *Nemeth* (development of a marina, condominiums, and hotel project at the mouth of the Manistee River on the shore of Lake Michigan). *Nemeth, supra* at 35.

In our opinion, the most significant clarification that the *Nemeth* opinion provides is which standard to apply in a MEPA action:

> [E]ach alleged MEPA violation must be evaluated by the trial court using the pollution control standard [this may be a standard for pollution control, a standard for an antipollution device, or a standard for a certain procedure, MCL

---

[1] In *Portage, supra* at 282, this Court considered the following factors when determining whether the effect of the proposed activity rose to the level of a MEPA violation:

In determining whether the impact of a proposed action on wildlife is so significant as to constitute an environmental risk and require judicial intervention, the court should evaluate the environmental situation prior to the proposed action and compare it with the probable condition of the particular environment afterwards. The factors the court should consider include: (1) whether the natural resource involved is rare, unique, endangered, or has historical significance, (2) whether the resource is easily replaceable . . . , (3) whether the proposed action will have any significant consequential effect on other natural resources . . . , and (4) whether the direct or consequential impact on animals or vegetation will affect a critical number, considering the nature and location of the wildlife affected.

324.1701(2)] appropriate to the particular alleged violation. Assuming that the *Portage* factors were proper for assessing whether the activity in that case violated the MEPA, it does not follow that the *Portage* factors, like the factors used in [*West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979)], are the proper pollution control standard here. A pollution control standard indeed has been articulated by the Legislature, through the [SESCA], and by the DNR, through the rules promulgated by it pursuant to the [SESCA]. [*Nemeth, supra* at 35.]

We quote this portion of *Nemeth* to show that a MEPA violation must be evaluated using the appropriate standard or procedure. In this case, as previously stated, MCL 324.63702, which specifically describes the exclusive circumstances under which mining in critical sand dune areas may be granted, provides the appropriate standard to be applied in the instant matter. MCL 324.1701(2) provides that if there is a standard for pollution, for an antipollution device, or a "procedure" fixed by rule or otherwise, the court must determine whether it applies and if it is "deficient" may apply one that is not deficient. It is unclear how MCL 324.63702, which expressly provides the procedure for the DEQ to regulate mining specifically in critical dune areas, could be construed as anything but the appropriate "procedure" for allowing mining in critical dune areas. In fact, the requirements of MCL 324.63702 are more akin to a "standard or procedure" than the requirements of the SESCA that were applied as the "standard" in *Nemeth*. If there is an existing rule, standard, or procedure regulating such pollution, impairment, or destruction, the MEPA calls for its application unless the court views the existing rule as deficient to protect the nat-

ural resource, in which case the court may apply a stricter standard.

The Supreme Court in *Nemeth, supra* at 29-30, explained this Court's failure to recognize that the SESCA provided the applicable standard:

> At the heart of the Court of Appeals error in this case was its failure to consider subsection 1701(2) [of the MEPA], which provides:
>
> "In granting relief provided by subsection (1), if there is a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state, the court may:
>
> (a) Determine the validity, applicability, and reasonableness of the standard.
>
> (b) If a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court."
>
> This is a vital part of our courts' development of the "common law of environmental quality." However, the development of the common law in this area certainly does not preclude the Legislature or the DNR from further entering the arena of environmental law. To the contrary, that is expressly contemplated by subsection 1701(2). Nonetheless, the courts must still determine whether such legislative and administrative enactments are the appropriate "pollution control" standards to be applied to a claim under the MEPA, as the trial court properly determined in this case.
>
> This function of the Michigan courts was discussed by the United States Court of Appeals for the Sixth Circuit in *Her Majesty the Queen v Detroit*, 874 F2d 332 (CA 6, 1989). Noting that the MEPA is supplementary to other administrative and regulatory procedures provided by law, the court correctly stated that the MEPA specifically authorizes a court to determine the validity, reasonableness, and applicability of any standard for pollution or pollution control "*and* to specify a *new* or *different* pollution control standard if the

agency's standard falls short of the substantive require-
ments of MEPA."[5] *Id.* at 337 (emphasis in original).

Furthermore, the MEPA does not impose specific require-
ments or standards; instead, it provides for de novo review
in Michigan courts, allowing those courts to determine any
adverse environmental effect and to take appropriate mea-
sures. *Id.* at 341.

---

[5] Thus, if the trial court in this case had determined that
the [SESCA] did not provide sufficient environmental protec-
tion, that is, did not prevent likely or actual environmental
harm, it could have specified a different pollution control
standard that would have satisfied the MEPA. [*Nemeth*,
*supra* at 30 n 5.]

---

Thus, when a plaintiff brings a cause of action
under the MEPA, the court must identify the appropri-
ateness and applicability of a standard that meets the
substantive requirements of the MEPA. Moreover, if the
court finds the appropriate standard deficient—that
is, it does "not provide sufficient environmental pro-
tection" and does "not prevent likely or actual envi-
ronmental harm" or if the agency's standard "falls
short" of the MEPA's substantive requirements—the
court may specify a different, stricter standard. The
MEPA allows a court to determine the validity, applica-
bility, and reasonableness of the standard. However,
only if the applicable standard is *deficient* may the
court adopt a different, higher standard. MCL
324.1701(2)(b); *Nemeth, supra* at 30, n 5. The court
may not substitute a lesser standard and certainly
may not completely ignore an appropriate standard or
procedure. By its own terms, the MEPA incorporates
the standards and procedures set forth in other envi-
ronmental laws that are specifically tailored to the

circumstances and natural resource at issue—in this case, mining in critical dune areas.

In the present case, rather than addressing MCL 324.63702, Judge Schofield simply addressed whether TechniSand's proposed mining was likely to "pollute, impair, or destroy" the natural resource in this case— the critical dune area. In essence, Judge Schofield applied MCL 324.63709, the general standard of permitting for mining in any dune area, which mirrors the standard set forth in the MEPA under MCL 324.1703. Judge Schofield's reasoning effectively eliminated MCL 324.63702, which deals specifically with mining in critical dune areas. Judge Schofield erred in disallowing plaintiff to proceed by applying the MEPA to the SDMA and the SDPMA.

Although defendants focus on the fact that *Nemeth* involved the SESCA and a "pollution standard" and makes the obvious observation that this case involves mining and not "pollution" per se, we find that distinction insignificant in light of the language of the statute (MEPA, MCL 324.1701[2]). The MEPA deals with pollution, impairment, and destruction of natural resources. Obviously, pollution, impairment, and destruction may stem from a multitude of causes, whether the dumping of chemicals, the drilling of wells, or the removal of earth or sand. The MEPA encompasses many scenarios.[2]

---

[2] We further note that although subsection 1701(2) speaks in terms of whether a "standard for pollution or antipollution device or procedure" exists, but does not specifically include whether a standard for impairment or destruction of a natural resource exists, our Supreme Court in *Nemeth* did not seem to find that to be an important point in that case in which soil erosion, rather than what is commonly thought of as pollution, was at issue. That is, the Court's discussion of how to determine the

In fact, in its brief, the DEQ concedes that part 637 (the SDMA) contains environmental standards similar to the SESCA standards in *Nemeth*. The DEQ argues, however, that the only standards in part 637 are found at MCL 324.63705, 324.63706, and 324.63707. These sections require an applicant to submit an EIS, a progressive cell-mining unit and reclamation plan, as well as a fifteen-year mining plan. The DEQ contends that simply by following these general procedures, the "standard" for mining in a critical dune area has been met. In doing so, the DEQ ignores MCL 324.63702. The DEQ, in essence, contends that once a permit is issued, it is beyond substantive challenge and that a MEPA challenge may only be procedural. The DEQ's interpretation of part 637 renders the requirements of MCL 324.63702 nugatory. "When construing a statute, the court should presume that every word has some meaning and should avoid any construction that would render the statute, or any part of it, surplusage or nugatory." *Karpinski v St John Hosp-Macomb Center Corp*, 238 Mich App 539, 543; 606 NW2d 45 (1999).

Further, the DEQ interprets part 637 as allowing authorization to mine in critical dune areas "unless the mining will violate MEPA." This interpretation conflicts with the clear language of § 63702 that the DEQ shall not issue a permit "unless" the applicant falls within one of the exceptions found in MCL 324.63702. The DEQ contends that § 63702 is not a "pollution standard, or even an analogous standard protecting the environment." However, it is clear that the MEPA is

appropriate standard is not restricted only to pollution of the environment and may also extend to impairment or destruction of a natural resource.

not limited to "pollution" cases, because by its own language it applies to actual or potential pollution, impairment, or destruction, thereby covering a much wider range of environmental concerns than literal pollution. Furthermore, a commonsense interpretation of MCL 324.63702 dictates that it serves to protect the environment by limiting those who may mine in critical dune areas. Thus, the DEQ's attempt to distinguish *Nemeth* on these bases is specious.

TechniSand argues that *Nemeth* is distinguishable from this case because the plaintiffs in *Nemeth* exhausted their administrative remedies before seeking relief under the MEPA. However, the SESCA, which was the environmental standard applied under the MEPA in *Nemeth*, specifically requires parties to seek review in accordance with the Administrative Procedures Act (APA), MCL 24.201 *et seq.* MCL 324.9112. No similar requirement exists in MCL 324.63701 *et seq.*

TechniSand also argues that *Nemeth* is distinguishable because it involved "construction activities which actually violated [SESCA]" rather than "review of the procedure by which the permit was granted." The MEPA does not require that actual activity be occurring, however, because it contemplates the prevention of impairment, destruction, and pollution before they begin. MCL 324.1703(1).

Thus, we find defendants' attempts to distinguish *Nemeth* unpersuasive. Just as our Supreme Court in *Nemeth, supra* at 27, 29, relied on the purpose of the SESCA, explaining that it is "to protect Michigan waters from pollution, the greatest source of which is sedimentation," and just as it pointed out that "the Legislature has clearly provided that the protection of the soil and water of this state through the prevention of

sedimentation and erosion is of the utmost importance," this Court must acknowledge the purpose of the SDMA, MCL 324.63701 *et seq.*, and the related purpose of the SDPMA, MCL 324.35301 *et seq.*, to which the SDMA refers.

In the SDMA, MCL 324.63702(1) incorporates by reference the definition of "critical dune area" as defined in "part 353," which is MCL 324.35301 of the SDPMA: "(c) 'Critical dune area' means a geographic area designated in the 'atlas of critical dune areas' dated February 1989 that was prepared by the department."

In turn, the SDPMA includes significant legislative findings. MCL 324.35302 provides:

> (a) The critical dune areas of this state are a unique, irreplaceable, and fragile resource that provide significant recreational, economic, scientific, geological, scenic, botanical, educational, agricultural, and ecological benefits to the people of this state and to people from other states and countries who visit this resource.
>
> (b) Local units of government should have the opportunity to exercise the primary role in protecting and managing critical dune areas in accordance with this part.
>
> (c) The benefits derived from alteration, industrial, residential, commercial, agricultural, silvicultural, and the recreational use of critical dune areas shall occur only when the protection of the environment and the ecology of the critical dune areas for the benefit of the present and future generations is assured.

Although the SDMA refers to the SDPMA for certain definitions and grew out of the SDPMA, currently the SDMA specifically addresses *mining* in sand dune areas (both noncritical dune areas and critical dune areas), while the SDPMA deals with all other permitted uses of the sand dune areas. This division of purpose is illus-

trated by MCL 324.35301, which defines "use" by the exclusion of mining:

> (j) "Use" means a developmental, silvicultural, or recreational activity done or caused to be done by a person that significantly alters the physical characteristic of a critical dune area or a contour change done or caused to be done by a person. Use does not include sand dune mining as defined in part 637.

MCL 324.35303 specifically addresses notification to local governments and property owners of designated critical dune areas as included in the *Atlas of Critical Dunes* of February 1989. Significantly, MCL 324.35304 spells out detailed and specific procedures dictating those "uses" not including mining in critical dune areas, while MCL 324.35305 provides a specific procedure for persons aggrieved by an issuance or denial of a permit for those "uses" not including mining and expressly requires aggrieved parties to seek relief in accordance with the APA. No similar requirement exists for sand dune mining permits issued under part 637.

Despite part 353's focus on nonmining uses of sand dune areas, it still provides the definition section for its offshoot companion, the SDMA and part 637. Therefore, the Legislature's findings regarding the "unique, irreplaceable, and fragile" critical dune areas of the state at the very least indicate the value it assigns to such critical dune areas and explains the restrictions placed on utilization of critical dune areas.

In summary, when a statute exists that regulates an activity through particular standards and procedures, including those involving eligibility for permits, that statute "fills in the blank" to provide the standard for

review under the MEPA. As our Supreme Court explained in *Nemeth, supra* at 30, although the MEPA calls for the courts to develop the "common law of environmental quality," that fact "certainly does not preclude the Legislature . . . from further entering the arena of environmental law. To the contrary, that is expressly contemplated by subsection 1701(2)." There will not always be an existing, applicable standard, in which case the court may simply apply the general "umbrella" standard under the MEPA prohibiting the impairment, destruction, or pollution of a natural resource. However, in this case, as in *Nemeth*, the Legislature entered the arena and prohibited mining in critical dune areas except under two specific circumstances. The Legislature's prohibition is not merely a "nicety," nor is it merely "procedural." Accordingly, part 637, the SDMA, provides the standard and procedure for mining in critical dune areas in this MEPA action.

### III. TIMELINESS OF PLAINTIFF'S CLAIM REGARDING THE PERMIT

Plaintiff asserts that the trial court incorrectly determined that its challenge to the DEQ's granting of the amended permit was merely one seeking judicial review of the decision of an administrative agency. Therefore, in order for it to be timely, it must have been brought within ninety days of the granting of the permit. We agree. "Issues of statutory interpretation are reviewed de novo as issues of law." *McClellan v Collar (On Remand)*, 240 Mich App 403, 409; 613 NW2d 729 (2000).

MCL 324.1704 contains permissive language that suggests that a court may, but is not required to, remit parties to existing or available administrative

procedures before inquiring directly into an environmental claim. Further, when the Legislature requires parties to exhaust administrative remedies, it says so. The MEPA does not require parties to exhaust administrative remedies. In addition, the issuance of a permit can be the subject of a MEPA claim, and no actual activity is required to trigger its protection. For these reasons, we conclude that plaintiff's contention that the requirement for issuance of an amended permit set forth in MCL 324.63702 as being the proper standard for determining a violation of the MEPA is not time-barred.

Both defendants characterize plaintiff's arguments as two-fold: one, as an attempt to make out a prima facie case of a MEPA violation and, two, as a "purely procedural" administrative challenge to the issuance of the amended mining permit. Defendants allege that plaintiff has failed to establish the former and is time-barred from asserting the latter. Specifically, defendants contend that plaintiff was required to challenge the issuance of the permit in some other, earlier procedural administrative review forum and failed to do so. Although the crux of both defendants' arguments is the same (i.e., a party can never challenge the issuance of a permit except within administrative proceedings), we note that only TechniSand specifically relies on the APA procedure in its brief. The DEQ makes only vague references to an unspecified administrative procedure. By agreeing, Judge Schofield rendered nugatory the language found in the MEPA, MCL 324.1701, and eliminated from consideration the requirements for amending a mining permit set forth for the DEQ in the SDMA, MCL 324.63702. Judge Schofield allowed plaintiff to go forward to trial using only

the standard set forth in MCL 324.63709 for evaluation of its MEPA claim. Thus, Judge Schofield's ruling resulted in consideration only of whether the proposed mining is likely to impair or destroy the natural resource and did not consider whether the DEQ properly granted the amended permit.

Initially, it must be understood that the APA was appropriately followed. Administrative proceedings were held and the proper procedure was followed for those proceedings under the APA. Nonetheless, the agency failed to comply with the proper standard or procedure because it issued the amended permit without regard for the requirements of MCL 324.63702. We view plaintiff's challenge under the MEPA and the SDMA as a substantive challenge, appropriately brought eighteen months after the issuance of the permit and before the mining began. This distinction is important because it is one that the trial court failed to recognize.

Plaintiff's cause of action relies on the MEPA, the SDMA, and the SDPMA. None of the relevant portions of these statutes contain time limitations. Nonetheless, in contrast to Judge Peterson, who noted that if the Legislature had intended there to be a statute of limitations in the MEPA it would have added one, both defendants as well as Judge Schofield assumed without citing authority[3] that plaintiff's challenge based on the MEPA and MCL 324.63702 was a purely "adminis-

---

[3] On appeal, however, TechniSand contends that MCL 24.304(1) provides that a petition for judicial review of an agency's final order must be brought within sixty days after the mailing of notice of that order, and that because plaintiff's complaint was filed approximately seventeen months after the amended permit was issued, it was untimely.

trative" or "procedural" challenge and that plaintiff's claim was time-barred.

In support of its contention that a MEPA claim can be based on improperly issued permits, plaintiff relies on *West Michigan Environmental Action Council v Natural Resources Comm* (WMEAC), *supra*, and *Nemeth*, *supra*, in which our Supreme Court inquired directly into an environmental controversy and invalidated already issued permits. In *WMEAC*, the plaintiffs brought a MEPA claim against the Natural Resources Commission (NRC), contending that the drilling of ten exploratory wells for oil and gas would likely impair or destroy natural resources, specifically wildlife in the affected area. *WMEAC*, *supra* at 749-750. Pursuant to negotiations between the drilling companies and the NRC, those entities entered into a consent order adopting a limited development plan. The plaintiffs then sought to intervene and moved for a hearing on the consent order. The NRC denied the motion on the ground that it was premature because it preceded the application for permits. *Id.* at 749. One of the oil companies subsequently applied for the permits to drill the ten wells, and the Supervisor of Wells granted the permits. *Id.* The plaintiffs then brought the MEPA suit claiming that the consent order was unlawful and was likely to lead to the impairment of wildlife in the area. On that basis, the plaintiffs sought an order restraining the issuance of the permits. *Id.* at 750. The trial court decided against the plaintiffs.

On appeal, our Supreme Court noted that the record below was unclear regarding whether the act of granting the permits was part of the conduct

alleged as being likely to impair or destroy the natural resource. The Court then stated:

> Nonetheless, all parties presented evidence on the likely effect of the drilling of the ten wells. Furthermore, the trial court chose to address the issue of the likelihood of pollution, impairment or destruction from the drilling activities contemplated by the ten permits.
>
> We conclude that the issuance of the permits to drill ten exploratory wells was properly before the circuit court as conduct alleged to be likely to pollute, impair and destroy the air, water or other natural resources or the public trust therein. The effects of these permits were comprehensively treated at the trial level, both by the parties and by the circuit judge. . . .
>
> Therefore, plaintiffs' allegation that the consent order is likely to lead to pollution, impairment or destruction of the natural resources . . . can fairly be said to include within it an allegation that the issuance of permits for drilling test wells will have such result, the issuance of these permits being an inevitable consequence of the adoption of the consent order. [*Id.* at 751.]

The Court went on to note that subsection 1204(4) of the MEPA [then MCL 694.1204, now MCL 324.1704]

> specifically indicates that the usual standards for review of administrative actions under the Administrative Procedures Act . . . are inapplicable once an environmental protection act case has been filed in a circuit court. The environmental protection act would not accomplish its purpose if the courts were to exempt administrative agencies from the strict scrutiny which the protection of the environment demands. [*WMEAC, supra* at 754.]

We acknowledge that the last quotation from *WMEAC* addresses the question whether the trial court improperly deferred to the DNR's conclusion that the proposed drilling would not impair or destroy the

natural resource. Nonetheless, we conclude that the quoted language from that opinion indicates that the question whether an agency's issuance of permits was proper may form the basis for a MEPA claim. Further, in that opinion, the Court expressly stated that "the usual standards for review of administrative actions under the Administrative Procedures Act . . . are inapplicable once an environmental protection act case has been filed in a circuit court." Therefore, we conclude that the trial court in the present case should have considered whether the DEQ properly granted the amended permit and the court erred in concluding that the time requirement for judicial review of administrative agency decisions was controlling.

In addition, it is significant that the only reference the MEPA makes to any administrative proceedings is found in MCL 324.1704, and the reference is permissive. MCL 324.1704 provides:

> (1) The court *may* grant temporary and permanent equitable relief or may impose conditions on the defendant that are required to protect the air, water, and other natural resources or the public trust in these resources from pollution, impairment, or destruction.
>
> (2) *If* administrative, licensing, or other proceedings are *required or available* to determine the legality of the defendant's conduct, the court *may* direct the parties to seek relief in such proceedings. Proceedings described in this subsection shall be conducted in accordance with and subject to the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.328 of the Michigan Compiled Laws. *If* the court directs parties to seek relief as provided in this section, the court *may* grant temporary equitable relief if necessary for the protection of the air, water, and other natural resources or the public trust in these resources from pollution, impairment, or destruction. In addition, the court retains jurisdic-

tion of the action pending completion of the action to determine whether adequate protection from pollution, impairment, or destruction is afforded.

(3) Upon completion of proceedings described in this section, the court shall adjudicate the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources, in accordance with this part. In adjudicating an action, the court may order that additional evidence be taken to the extent necessary to protect the rights recognized in this part.

(4) If judicial review of an administrative, licensing, or other proceeding is available, notwithstanding the contrary provisions of Act No. 306 of the Public Acts of 1969 pertaining to judicial review, the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review. [Emphasis added.][4]

The word "may" designates discretion. *Jordan v Jarvis*, 200 Mich App 445, 451; 505 NW2d 279 (1993). Thus, although the statute provides that "[p]roceedings described in this subsection shall be conducted in accordance with and subject to the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.328 of the Michigan Compiled Laws," it does so conditioned on the court's discretion. The court "may" direct the parties to seek relief in such proceedings if those proceedings are "required" or "available." The permissive language within MCL 324.1704 indicates that other "proceedings" may *not* be required or available and that the court may choose *not* to direct the parties to seek relief in such proceedings.

The permissive nature of MCL 324.1704 is demonstrated in *WMEAC, supra* at 753. In the context of

---

[4] The Court in *WMEAC, supra* at 752-753, relied on these provisions for its conclusions.

explaining that the trial judge erred "in failing to exercise his own totally independent judgment" under the MEPA, our Supreme Court averred that a trial court in which a MEPA suit is filed retains original jurisdiction of the matter, "*even if it chooses* to remit parties to administrative proceedings." *Id.* at 753-754 (emphasis added).

TechniSand argues that MCL 324.1704 empowers courts to direct the parties to seek administrative proceedings if required or "available" and to retain jurisdiction to review the results of those proceedings. TechniSand emphasizes that plaintiff's action was commenced more than a year after the availability of the administrative proceedings. By failing to quote the full context and language of the statute however, TechniSand glosses over the discretion with which the court is "empowered" under the MEPA. The language of MCL 324.1704 is permissive. The language within *WMEAC*, in which our Supreme Court has provided a thorough review of MCL 324.1704, also emphasizes that the court may send the parties to existing administrative proceedings "if it chooses." *WMEAC, supra* at 753. Further, MCL 324.1704 provides that the court may direct the parties to seek relief in administrative proceedings if they are required or available. The administrative proceedings were no longer available at the time that plaintiff filed this MEPA lawsuit.

Moreover, although TechniSand contends that the DEQ's determination is, of course, entitled to a presumption of regularity, this contention contradicts our Supreme Court's strong message in *WMEAC* that the "usual standards for review of administrative actions . . . are inapplicable once an environmental

protection act case has been filed in a circuit court" and that the "environmental protection act would not accomplish its purpose if the courts were to exempt administrative agencies from the strict scrutiny which the protection of the environment demands." *Id.* at 754. Indeed, a trial court must exercise totally independent judgment in MEPA cases, lest it commit error requiring reversal. *Id.* Given the strong language of *WMEAC*, a case decided in the context of MCL 324.1704, TechniSand's assertions that deference to the agency is required are unfounded.

Additionally, TechniSand implies that the significant difference between this case and *WMEAC* and *Nemeth*, in which permits were invalidated, is that in those cases, the defendants "conducted activities which impaired the environment in violation of the MEPA and the SESCA, not because they weren't eligible for permits they had and abused." The implication is that the MEPA may only be used to stop the entities actually doing the damage to the environment rather than an agency that merely issues a permit and may only be used after actual activity has had an effect. Both contentions are inaccurate. The MEPA contemplates the prevention of impairment, destruction, or pollution before it begins. See MCL 324.1703 ("[w]hen the plaintiff in the action has made a prima facie showing that the conduct of the defendant . . . is likely to pollute, impair, or destroy . . ."). Further, the Court in *Genesco* expressly provides that the actions of agencies may be challenged in a MEPA action, and this fact is evident within the reasoning of *WMEAC*, *Nemeth*, and *City of Jackson*. As plaintiff points out in its reply brief, "[w]hether the applicant gets the permit determines whether the activity will take place

at all." A claim under the MEPA may be founded on *probable* damage to the environment. *City of Jackson, supra* at 490. Thus, a MEPA violation is not restricted to activity that is already occurring. Issuance of a permit in and of itself, which is an agency action, can invoke the MEPA, as long as it is "the last hurdle in moving from the paperwork to the outdoors." *Wortelboer v Benzie Co*, 212 Mich App 208, 221; 537 NW2d 603 (1995). In any case, the validity of permits has been the subject of various direct circuit court actions brought pursuant to the MEPA. See *WMEAC, supra*; *Holly Twp v DNR*, 189 Mich App 581; 473 NW2d 778 (1991), on reh 194 Mich App 213; 486 NW2d 307 (1992), vacated on other grounds 440 Mich 891 (1992); *Addison Twp v Gout*, 171 Mich App 122; 429 NW2d 612 (1988), rev'd in part on other grounds 435 Mich 809 (1990). The MEPA allows for "direct" review of an "administrative agency's decision." *Genesco, supra* at 50. Actual activity need not have already begun for the MEPA to become operational. Nowhere is this clearer than in the language of the MEPA itself, which provides that "any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred *or is likely to occur* . . . ." MCL 324.1701(1) (emphasis added).

Further, the Legislature included statutes of limitation in certain other portions of the NREPA, e.g., in MCL 324.35305 of the SDPMA. This indicates that if the Legislature intended there to be one under MCL 324.63702, it would have included one. MCL 324.35303 of the SDPMA specifically addresses notification to local governments and property owners of designated critical dune areas as included in the Atlas of Critical Dune Areas of February 1989. Significantly, MCL

324.35304 spells out detailed and specific procedures dictating those "uses" not including mining in critical dune areas, while MCL 324.35305 provides a specific procedure for persons aggrieved by an issuance or denial of a permit for those "uses" not including mining and expressly requires aggrieved parties to seek relief in accordance with the APA. Significantly, MCL 324.35305(1) and (2) of the SDPMA provide for a formal hearing and review process, in accordance with the APA, for persons aggrieved "by a decision of the department in this regard to the issuance or denial of a permit or special exception *under this part.*" (Emphasis added). Thus, the review process imposed on applicants seeking permits for uses *other than mining* in critical sand dune areas does not apply to those aggrieved by a permit decision under part 637. Similarly, the SESCA statute that provided the standard in *Nemeth* specifically required parties to comply with the APA. No similar requirement exists for sand dune mining permits issued under any portion of part 637.

Further, defendants' proposition also runs contrary to the fact that a MEPA litigant is not required to exhaust administrative remedies before seeking judicial review. *Genesco, supra; Holly Twp, supra* (the MEPA and the Solid Waste Management Act do not mandate that the plaintiff exhaust administrative remedies before filing suit); see, also, *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 305-306; 224 NW2d 883 (1975).

The general rule is that a litigant seeking judicial review of a decision by an administrative agency has three potential avenues of relief: (1) the review prescribed in the statute applicable to the particular agency, (2) an appeal pursuant to the RJA and Const

1963, art 6, § 28, or (3) the method of review provided by the APA. See *Hopkins v Parole Bd,* 237 Mich App 629, 637-638; 604 NW2d 686 (1999), *Attorney General v Public Service Comm No 1,* 237 Mich App 27, 40; 602 NW2d 207 (1999), and *Palo Group Foster Care, Inc v Dep't of Social Services,* 228 Mich App 140, 145; 577 NW2d 200 (1998).

While there is a "review" procedure described in part 353, which governs all other commercial uses of critical dune areas and specifically excludes sand dune mining, no review procedure is designated under part 637, which deals particularly with mining. This is where the MEPA comes into play because it uniquely provides for independent, direct review of an agency decision in environmental cases. *Genesco, supra* at 50; see, also, MCL 324.1704 (a court may direct parties to administrative and other proceedings if they are "required or available"). Under part 637, the SDMA, they are not required; under the MEPA, a court may, therefore, directly review the agency action.

In *City of Jackson, supra* at 491, this Court clearly opined that the trial court had erred in treating the plaintiffs' action as a petition for review of the administrative decision to issue the air use permit (also called a "permit to install") for the defendant's asphalt plant. In so doing, the Court relied on the fact that the trial court had ruled against the plaintiffs on all counts alleged in their complaint, but had nevertheless placed conditions on the permit. Therefore, this Court reasoned that the plaintiffs were not entitled to relief under MCR 2.601(A) and stated that the "[p]laintiffs' action did not encompass a review of the permit, which is provided for by statute." *City of*

*Jackson, supra* at 492. In the air pollution context, MCL 324.5505(8) provides that any appeal of the issuance or denial of a permit in that section must be taken within ninety days after the final permit action and exclusively pursuant to the RJA.

The implication of the Court's reasoning in *City of Jackson* and the language in the Air Pollution Control section of the NREPA (MCL ch 324) is that when the Legislature intends to limit an appellant's right of appeal to a particular process and time frame, it does so explicitly. The *City of Jackson* case also implies that although under the circumstances of that case the issue was moot because the asphalt plant was being operated under a new permit, the Court would have considered whether the original conditional use permit for operation of the plant was void because the allowed time for completing construction had expired. *Id.* at 493. Further, there is no time limit in the MEPA. Therefore, the agency's authority to issue a permit may be challenged under the MEPA as long as impairment or destruction of a natural resource is likely or actually occurring without reference to when an agency issued the permit through which the impairment or destruction is occurring.

Further, although judicial review under the APA is not de novo, *Michigan Waste Systems v DNR*, 147 Mich App 729, 735; 383 NW2d 112 (1985), review under the MEPA is de novo, *Nemeth, supra* at 30. In addition, although an agency decision reviewed under the APA is entitled to deference, *THM, Ltd v Comm'r of Ins*, 176 Mich App 772, 776; 440 NW2d 85 (1989), "it is error requiring reversal for the trial court to defer to an administrative agency's conclusion that no pollution, impairment, or destruction of a natural

resource will occur" in a MEPA action, *City of Jackson, supra* at 489; see, also, *WMEAC, supra* at 752. The factors used to make this determination "necessarily depend on the facts of the case, the natural resources involved, and the evidence presented." *City of Jackson, supra* at 489. Thus, there would be no point in requiring parties to exhaust their administrative remedies because no deference is allowed.

In summary, it appears that there is no statute of limitations in a MEPA action and there is no time limitation within the SDMA, part 637 of the NREPA, which we conclude provides the standard or procedure to be applied in this MEPA action. Thus, plaintiff's claim challenging the DEQ's authority to allow TechniSand to mine in a critical dune area and challenging TechniSand's qualifications under MCL 324.63702 is not time-barred.

### IV. MCL 324.63702 AND THE ISSUANCE OF THE PERMIT

Plaintiff argues that the DEQ lacked the authority to issue the permit to TechniSand to mine in the critical dune area because TechniSand did not qualify under either exception to the prohibition set forth under MCL 324.63702(1)(a) or (b). We agree. Because MCL 324.63702 cannot reasonably be interpreted to "grandfather in" parties who did not own a permit to mine in a critical dune area before July 5, 1989, and who did not own land adjacent to a critical dune area and a permit to mine in the noncritical dune area before July 5, 1989, the trial court erred in concluding that the DEQ had statutory authority to issue the amended permit and erred in denying plaintiff's summary disposition motion.

Although Judge Schofield decided that plaintiff was time-barred from arguing that the DEQ lacked the authority to issue the amended permit to TechniSand under MCL 324.63702, he decided this issue, stating that TechniSand fell within the exception of MCL 324.63702(1)(b). The court concluded that MCL 324.63702(1)(a) did not apply. Similarly, both the DEQ and TechniSand argue that TechniSand qualified under one of the exceptions to the prohibition on sand dune mining in critical dune areas provided by MCL 324.63702. Interestingly, on appeal, the DEQ argues that TechniSand qualifies for the exception allowing it to mine in the critical dune area under MCL 324.63702(1)(a), while TechniSand argues that it qualifies under MCL 324.63702(1)(b).

Specifically, the DEQ argues that "the important date [under subsection 1(a)] is when the permit governing the site first issued" and that "[t]he Legislature did not say that the operator had to own the permit qualifying for amendment under § 63702(1)(a) on a certain date or that the permit had to be held by the original permittee." Defendants are essentially arguing that § 63702 allows an amended permit to be granted to the operator who held the original permit before July 5, 1989 (i.e., Manley Brothers) or to its successor (TechniSand). In other words, it is not dispositive that TechniSand did not own the "adjacent land" before July 5, 1989, because the original permit that TechniSand apparently received when it was deeded the land and sought to amend was issued to its predecessor before July 5, 1989.

The DEQ contends that the "entire Nadeau site [including both the eastern, noncritical dune area for which it had a permit to mine and the western, criti-

cal dune area, which the original permit did not cover] became subject to the mining plan approved in 1979 when Manley Brothers purchased the 100 acres contiguous to the original 26 acre holding and then obtained the permit." The DEQ's argument is based on the fact that the bonding and progressive cell-unit provisions of the SDMA treat the owner's entire contiguous tract as a "unit" for purposes of the restrictions on the number of "cells" that may be mined at one time. The reason is that the Geological Survey Division will not grant a permit for a new sand dune mining operation that is adjacent to an existing operation. This policy "ensures that a company does not apply for several permits on all the acreage it holds in an attempt to mine, and retain as active, more than the three (3) cell units allowed" by the SDMA. The DEQ takes this policy, which exists solely for purposes of preventing companies from mining more than three cell units at a time, and argues that "TechniSand held a permit issued before the effective date of the act [the SDMA] that covered its entire Nadeau site." We find this argument disingenuous. The policy of treating an owner's property as one "cell unit" simply for the purpose indicated above is, as plaintiff contends, "a far cry from showing that the 1979 permit that TechniSand acquired from Manley Brothers authorized mining of the Nadeau Expansion critical dune area. . . . It did not." Manley Brothers had only a permit for the noncritical dune area, and that was the permit TechniSand purchased. Manley Brothers could not have expanded its mining operation into the adjacent area without obtaining an amendment of the existing permit. Manley Brothers would not be entitled to a permit to mine in the critical dune area of

the Nadeau Expansion if it had not acquired the critical dune area until 1991; thus, it is unclear how TechniSand, which did not acquire the critical dune area until 1991, would be entitled.

Further, if, as the DEQ contends, TechniSand qualified under subsection 1(a) because the important date is when the original permit issued, then subsection 1(b) would be rendered meaningless. MCL 324.63702(1)(b) deals specifically with proposed amendments seeking to include adjacent land in a critical dune area, and thus, if either exception covered this situation, b would. Subsection a addresses situations where either a renewal or an amendment of a permit is sought, while subsection b, more specifically, deals with the situation where an amendment is sought to include adjacent land that the operator owned before July 5, 1989, but for which the operator had not yet obtained a permit to mine. It would be illogical to say that an application for amendment that seeks to include "adjacent land" could be granted under subsection a. To do so would be to ignore the limitation within subsection b that requires the operator to have owned the adjacent land before July 5, 1989, and would render subsection b superfluous. "When construing a statute, the court should presume that every word has some meaning and should avoid any construction that would render the statute, or any part of it, surplusage or nugatory." *Karpinski, supra* at 543.

We agree with Judge Schofield's conclusion that if defendants relied on 1(a), such reliance would be misplaced. Subsections a and b must be read together because of their juxtaposition. Provisions must be read in the context of the entire statute so as to pro-

duce an harmonious whole. *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 159; 627 NW2d 247 (2001). A reasonable reading of MCL 324.63702 is that subsection a applies to the amendment or renewal of a permit that already permits mining in a particular already-defined area, while subsection b applies when the permit holder seeks to expand the permit to include adjacent land that contains a critical dune area and that it owned before July 5, 1989. Thus, subsection 1(a) is applicable where the amendment sought is for some purpose other than to mine adjacent land.

Further, to interpret subsection a as broadly as the DEQ suggests would mean that the DEQ could grant an amended permit regardless of whether the additional land was adjacent and regardless of when the additional land was acquired. The absurd result of this interpretation would be that the DEQ could "amend" any permit that existed before July 5, 1989, to include any critical dune area, no matter where it was located, and no matter when acquired, and, thus, the amending power of the DEQ would entirely consume the prohibition on mining in critical dune areas. Statutes should be construed to avoid absurd consequences, injustice, or prejudice to the public interest. *McAuley v General Motors Corp*, 457 Mich 513, 518; 578 NW2d 282 (1998). The DEQ's interpretation would also mean that any applicant who purchased a permit from someone who owned it before July 5, 1989, would be entitled to an amended permit to mine sand in adjacent critical dune areas. As plaintiff points out, this is in essence what the DEQ has done for TechniSand.

In contrast to the DEQ's argument, TechniSand argues that it qualified for the amended permit under MCL 324.63702(1)(b). Specifically, TechniSand argues that MCL 324.63701 does not treat the word "person" as synonymous with the word "operator." TechniSand also argues that the word "operator" was meant to be construed broadly. Citing the former SDPA, TechniSand also argues that the former definition of "person" was "an individual, partnership, firm, corporation, association, local unit of government, or other political subdivision of the state, or a state or state agency."

TechniSand's point is not clear. Apparently, TechniSand concludes that the term "operator" that is used in MCL 324.63702 should be interpreted as meaning "operations." That is, TechniSand seems to be arguing that as long as a particular sand mining operation existed before July 5, 1989, whether the land on which the operation is occurring is owned by the "person" to whom the original permit was granted or to any successor is immaterial for the purpose of application of the exceptions described in § 63702. We disagree.

MCL 324.63701(j), defines "operator" as "an owner or lessee of mineral rights or any other person engaged in or preparing to engage in sand dune mining activities with respect to mineral rights within a sand dune area."

The term "operator" is the term used in MCL 324.63702, the statute at issue. TechniSand does not explain why the term "operator" was used in MCL 324.63702, while the term "operation" appears in other sections of the statute where it makes contextual sense (e.g., MCL 324.63706[2], 324.63701[e]). We believe that the distinction indicates that the Legisla-

ture meant to "grandfather in" operators, not operations; otherwise, it would have used the term "operations." The Legislature is presumed to be familiar with the rules of statutory construction, and, when promulgating new laws, is presumed to be aware of the consequences of its use or omission of statutory language. *Stokes v Millen Roofing Co*, 245 Mich App 44, 60; 627 NW2d 16 (2001), rev'd on other grounds 466 Mich 660 (2002); *Lumley v Univ of Michigan Bd of Regents*, 215 Mich App 125, 129-131; 544 NW2d 692 (1996). If the statute provides its own glossary, the terms must be applied as explicitly defined. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 136; 545 NW2d 642 (1996); *Barrett v Kirtland Community College*, 245 Mich App 306, 314; 628 NW2d 63 (2001). Indeed, the statute does not define the term "operation." In any event, common sense dictates that the new owner of a permit who seeks expansion of a permit covering mining in noncritical dune areas to cover mining in critical dune areas 160 times greater than that covered initially would not be running the same "operation."

TechniSand also argues that other portions of the SDMA focus on activities, not owners. TechniSand minimizes the import of the specific language of MCL 324.63702 by arguing that other portions of the SDMA "concern themselves with existing operations, without regard to the formalities of enterprise." We find this contention misleading. Even assuming that TechniSand's characterization of the focus of other portions of the SDMA is accurate, it is clear that MCL 324.63702, which deals specifically with who may be authorized to mine in critical dune areas, focuses not on activities, but rather on ownership, location, and

timing. As previously stated the Legislature is presumed to be aware of the consequences of its use of language. *Stokes, supra.*

Next, TechniSand argues that the Legislature's intent in drafting MCL 324.63702 was to balance competing interests. TechniSand asserts that "the legislature did not focus on technical legal rules related to ownership issues." First, we fail to see the "balancing [of] competing interests" as the impetus for the enactment of MCL 324.63702, and TechniSand offers no persuasive authority for its assertion. For reasons previously discussed, we believe that MCL 324.63702 can only be reasonably interpreted as a prohibition on mining in critical dune areas, with two exceptions, which narrowly "grandfather in" existing operators. Second, TechniSand's assertion that the Legislature did not focus on "technical legal rules" relating to ownership issues contradicts the plain and specific ownership requirements of MCL 324.63702(1)(a) and (b).

TechniSand also argues that the manner in which it acquired the "operation" is not determinative and that it would be "absurd" to interpret MCL 324.63702 as limiting the exceptions to operators who made investments in reliance on the situation existing before the passage of § 63702, when mining in critical dune areas was not prohibited. These contentions are also unpersuasive. Moreover, this "absurd result" argument carries questionable, if any, weight. *People v McIntire*, 461 Mich 147, 155-156, n 2; 599 NW2d 102 (1999).

In support of its first contention, TechniSand provides various hypothetical examples regarding corporate acquisitions and structuring and argues that

interpreting "operator" within MCL 324.63702 to mean anything other than "operation" would produce results that hinge on what it refers to as the "mere corporate structure of the acquiring entity." The gist of TechniSand's argument is akin to Judge Schofield's reasoning that if TechniSand's acquisition had been something other than what it was, i.e., if TechniSand had merely acquired the stock belonging to Manley Brothers rather than the actual assets, the "operation" could have continued. Therefore, it should be allowed to "continue" into the expanded critical dune area despite the "corporate structure" of the transaction. We find this argument unpersuasive. It is based on a hypothetical example rather than on what actually occurred. The change of ownership and operating control of what formerly belonged to Manley Brothers should not be reduced to a "nicety[] of corporate law," as TechniSand contends, just to allow TechniSand to qualify under an exception to MCL 324.63702.

TechniSand fails to distinguish between its reliance as purchaser in 1991 and the Manley Brothers' presumed reliance as owners before July 5, 1989. Instead, TechniSand argues that the intent of the Legislature was to "preserve ongoing businesses and property rights and expectations, while affording some relief to over-utilization of important natural resources." TechniSand was not an "ongoing business," had no "property rights," and had no "expectations" before July 5, 1989. Therefore, it could not have reasonably relied on being able to mine in the Nadeau expansion area before MCL 324.67302 was created. In essence, TechniSand argues that because Manley Brothers may have relied on its ability to

someday mine in the critical dune area for which it did not have a permit, TechniSand, the new owner, should be deemed to have acquired that "reliance" years later. TechniSand's argument is unfounded. The transaction that TechniSand would have this Court regard as mere "corporate formalities" is the very transaction that disqualifies TechniSand from obtaining the amended permit to mine in the critical dune area that it acquired in 1991.

Notably, the DEQ interprets subsection b as we do, asserting that "the date of the acquisition of land adjacent to the land covered by a permit, whenever issued, becomes significant." The arguments posed by both the DEQ and TechniSand are unpersuasive. Under the facts of this case, TechniSand did not qualify for exception under MCL 324.63702(1)(a) or (b). It did not qualify under subsection a because the permit for the Nadeau Site did not include the extension into a critical dune area (the Nadeau expansion). Nor does it qualify under subsection b, because TechniSand did not own the critical dune area on July 5, 1989. TechniSand, which incorporated on July 12, 1991, purchased the property on July 31, 1991, when it acquired a deed conveying the land from Manley Brothers to TechniSand. Therefore, MCL 324.63702 had been in effect for two years before TechniSand invested in the property.

Judge Schofield's explanation for why he concluded that TechniSand qualified under subsection b is also unpersuasive. Judge Schofield found that subsection b was intended to allow permitted operations that were in existence on July 5, 1989, to be extended into adjacent areas if those adjacent areas were owned by the operator on that date. Despite this conclusion, he

found that TechniSand was entitled to the amended permit even though it was not the operator with the permit to mine on July 5, 1989, and even though TechniSand did not own the adjacent site on July 5, 1989. One conclusion does not logically flow from the other. The statute could not have intended to protect a pre-July 5, 1989, owner of an adjacent site who was not also the operator at the time because such a nonoperator owner would presumably not have acquired the property for mining and would not fall within the category of those placing reliance on the ability to mine—the category of owners the Legislature sought to protect.

The trial court's reasoning closely mirrors TechniSand's reasoning and involves the assumption that the purpose of the statute was to grandfather in operations, not operators. For the reasons discussed, we disagree. More probably, the purpose was to allow existing operations to continue, but to restrict the expansion of existing operations into critical dune areas. The limitation within subsection b limited expansion to existing operators with existing ownership of adjacent properties. If the Legislature had not intended to tie such expansions to ownership, it would have used the term "operations"; instead, it used the word "operators" in MCL 324.63702 and expressly defined the term "operator." We believe that the Legislature's choice of language was intentional.

Perhaps most significantly, if the privilege of expansion into critical dune areas were tied to "operations" as opposed to "operators," there would be no limit to who could obtain amendments to mine in critical dune areas. The trial court interprets MCL 324.63702 to mean that any operation that existed on

July 5, 1989, should continue to exist and be allowed to expand indefinitely, regardless of changes of ownership and regardless of major changes in the scope of the operation, even when those changes involve critical dune areas. In other words, MCL 324.63702 would be rendered meaningless because each new permit owner could point back to the date on which the first operation at the site commenced and could successfully argue that theirs was simply a continuance. This approach completely overlooks the ownership focus of the definition of "operator" and disregards the idea that existing owners were "grandfathered in" on the bases of their reliance on the state of the old law and the right to mine in critical dune areas.

Further, the amended permit TechniSand sought from the DEQ allows mining in a critical dune area and removal of eight million tons of sand altogether. By contrast, the original permit that TechniSand purchased as an asset from Manley Brothers allowed mining in a noncritical dune area and allowed the removal of only fifty thousand tons of sand. Construing TechniSand's proposed operation as a mere continuance of the original, permitted operation necessitates a strained reading of MCL 324.63702. Yet, this incredible result would be allowed under the trial court's interpretation that would allow "operations," rather than "operators," to qualify for exceptions to the prohibition on mining in critical dune areas.

We conclude that the trial court erred in denying plaintiff's motion for summary disposition. Summary disposition of all or part of a claim or defense may be granted when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and

the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10).

There are no factual disputes. Regarding the land for which the amended permit was granted, it is established that TechniSand did not own the land or the rights to mine the sand on the land before July 5, 1989. Therefore, we conclude that plaintiff was entitled to judgment as a matter of law on the question whether the DEQ should have granted the amended permit.

In light of our resolution of the above issues, we need not address plaintiff's other arguments.

V. CONCLUSION

In summary, we conclude that plaintiff's MEPA action, which incorporates the standard set forth in MCL 324.63702, is not time-barred. We also conclude that TechniSand did not qualify for an exception to the prohibition on sand dune mining in critical dune areas under MCL 324.63702. Accordingly, the DEQ was not authorized to amend the permit to allow TechniSand to mine in critical dune areas. We reverse the trial court's order granting partial summary disposition to defendants and the judgment of no cause of action, and remand for entry of an order granting summary disposition in favor of plaintiff. We do not retain jurisdiction. Plaintiff may tax costs.