**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

PRESERVE THE DUNES, INC.,

    Plaintiff-Appellee,

v                                              No. 122611

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

    Defendant,

and

TECHNISAND, INC.,

    Defendant-Appellant.

_____

PRESERVE THE DUNES, INC,

    Plaintiff-Appellee,

v                                              No. 122612

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

    Defendant-Appellant,

and

TECHNISAND, INC,

    Defendant.

_____

1

**BEFORE THE ENTIRE BENCH**

**CORRIGAN, C.J.**

Defendant Michigan Department of Environmental Quality (DEQ) and defendant TechniSand, Inc., appeal a Court of Appeals decision holding that the DEQ improperly granted a sand dune mining permit to TechniSand, contrary to the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.*[1] The only issue properly before us is whether MEPA authorizes a collateral challenge to the DEQ's decision to issue a sand dune mining permit under the sand dune mining act (SDMA), MCL 324.63701 *et seq.*, in an action that challenges flaws in the permitting process unrelated to whether the conduct involved has polluted, impaired, or destroyed, or will likely pollute, impair, or destroy natural resources protected by MEPA. Because MEPA does not authorize such a collateral attack, we reverse the decision of the Court of Appeals and remand to that Court for expedited review of the remaining issues of plaintiff Preserve the Dunes (PTD).[2]

---

[1] 253 Mich App 263; 655 NW2d 263 (2002).

[2] PTD is an ad hoc organization of local citizens formed for the purpose of instituting this lawsuit.

## I. Factual Background and Procedural Posture

In 1991, defendant TechniSand purchased a sand mining operation with a mining permit that was set to expire in 1993. That permit did not allow mining in adjacent property, the Nadeau Site Expansion Area (NSE), which had been classified in 1989 as a "critical dune" area under MCL 324.35301 *et seq.*

Mining in critical dune areas was prohibited after July 5, 1989, subject to certain narrowly defined exceptions to MCL 324.63702(1):

> Notwithstanding any other provision of this part, the department shall not issue a sand dune mining permit within a critical dune area as defined in part 353 [MCL 324.35301 *et seq.*] after July 5, 1989, except under either of the following circumstances:
>
> (a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5, 1989, subject to the criteria and standards applicable to a renewal or amendatory application.
>
> (b) The operator holds a sand dune mining permit issued pursuant to section 63704 and is seeking to amend the mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989, the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an amended permit.

In late 1994, TechniSand applied for an amended permit under MCL 324.63702(1)(b). In April 1995, the Department of

Natural Resources (DNR)[3] denied the application on the ground that TechniSand was ineligible for an amended permit under subsection 1(b) because it had purchased the operation after July 5, 1989.

In May 1996, TechniSand amended and resubmitted its application and supporting documentation to the DEQ. After a public hearing, the DEQ approved TechniSand's application on November 25, 1996. TechniSand began mining the NSE area thereafter.

Nineteen months later, in July 1998, PTD sued defendants, seeking injunctive and declaratory relief under MEPA. MEPA provides a cause of action for declaratory and other equitable relief for conduct that is likely to result in the pollution, impairment, or destruction of Michigan's natural resources. MCL 324.1701 *et seq.*

PTD alleged that the DEQ violated MEPA when it approved TechniSand's amended mining permit. It further alleged that TechniSand's mining conduct violated MEPA. Defendants sought summary disposition because PTD's action was time-barred. The circuit court denied defendants'

_____

[3]During this time, the DNR was the administrative agency that regulated sand mining. In 1995, this responsibility was transferred from the DNR to the DEQ by Executive Reorganization Order No. 1995-16 (codified at MCL 324.99903).

motion.

PTD sought summary disposition after the original circuit judge had retired. His successor ruled that PTD's claim under the SDMA was indeed time-barred. It also held that plaintiff had established a prima facie MEPA claim on the basis of TechniSand's mining conduct.

After a seven-day bench trial on the MEPA claim alone, the court ruled that defendants had successfully rebutted PTD's prima facie case and entered a judgment of no cause of action. The court specifically found that "any adverse impact on the natural resources which will result from the sand mining will not rise to the level of impairment or destruction of natural resources within the meaning of MEPA."

The Court of Appeals reversed and remanded for entry of an order granting summary disposition for PTD. The Court of Appeals concluded that (1) the DEQ's decision to grant a permit could be challenged at any time under MEPA and (2) TechniSand did not qualify for a permit under § 63702. The DEQ and TechniSand filed applications for leave to appeal in this Court, and we granted leave.[4]

---

[4] 468 Mich 869 (2003).

5

## II. Standard of Review

The issue presented involves a question of statutory interpretation. We review de novo questions of statutory interpretation. *Oade v Jackson Nat'l Life Ins Co,* 465 Mich 244, 250; 632 NW2d 126 (2001).

## III

### A. Overview of MEPA

MEPA is contained in part 17, MCL 324.1701 *et seq.,* of the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.* To prevail on a MEPA claim, the plaintiff must make a "prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources, or the public trust in these resources. . . ." MCL 324.1703(1). The defendant may rebut the plaintiff's showing with contrary evidence or raise an affirmative defense that (1) there is no feasible and prudent alternative to the conduct and (2) the "conduct is consistent with the promotion of the public health, safety, and welfare in light of" the state's concern with protecting Michigan's natural resources. *Id.* The focus of MEPA is on defendant's conduct.

MEPA provides for immediate judicial review of allegedly harmful conduct. The statute does not require

exhaustion of administrative remedies before a plaintiff files suit in circuit court. MCL 324.1701(2). A court may, however, "direct the parties to seek relief" in available administrative proceedings. MCL 324.1704(2).

### B. Overview of SDMA Permit Process

The DEQ may authorize mining in critical sand dune areas under two specific conditions set forth in MCL 324.63702(1)(a) and (b):

> Notwithstanding any other provision of this part, the department shall not issue a sand dune mining permit within a critical dune area as defined in part 353 [MCL 324.35301 *et seq.*] after July 5, 1989, except under either of the following circumstances:
>
> (a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5, 1989, subject to the criteria and standards applicable to a renewal or amendatory application.
>
> (b) The operator holds a sand dune mining permit issued pursuant to section 63704 and is seeking to amend the mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989, the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an amended permit.

If an operator does not fall within one of these limited exceptions to the SDMA ban on mining in critical dunes areas, the inquiry ends. Nowhere in this initial inquiry is the DEQ required to evaluate the permit seeker's proposed conduct. Indeed, such an inquiry would be

7

pointless unless the DEQ first determined that the applicant was eligible for a permit on the basis of the applicant's status as either a past owner or operator.

Once the DEQ determines that an applicant is eligible to apply for a sand dune mining permit in a critical dune area under § 63702(1), the applicant must fulfill the requirements of § 63704. Specifically, applicants are required to submit the following to the DEQ:

> (a) A permit application on a form provided by the department.
>
> (b) An environmental impact statement of the proposed mining activity as prescribed by section 63705.
>
> (c) A progressive cell-unit mining and reclamation plan for the proposed mining activity as prescribed in section 63706.
> (d) A 15-year mining plan as prescribed by section 63707.

After the DEQ determines that the applicant has satisfied §§ 63702(1) and 63704(2), it must next determine whether the applicant meets the requirement of § 63709. Section 63709 prohibits the DEQ from approving an amended permit if the applicant's proposed conduct "is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in those resources, as provided by part 17." Thus, MEPA, in part 17, MCL 324.1701 *et seq.,* expressly controls the DEQ's § 63709

determinations.

C. MCL 324.1701 and *Nemeth v Abonmarche Development*

In addition to conferring power upon the attorney general, MCL 324.1701(1) authorizes a private cause of action under MEPA:

> The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

MCL 324.1701(2) provides:

> In granting relief provided by subsection (1), if there is a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state, the court may:
>
> ***
>
> (b) If a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court.

Thus, in *Nemeth v Abonmarche Development, Inc*, 457 Mich 16; 576 NW2d 641 (1998), we held that a violation of the soil erosion and sedimentation control act (SESCA), MCL 324.9101 *et seq.*, may establish a plaintiff's prima facie showing under MEPA because the SESCA contains a pollution control standard.

9

MCL 324.1702 is not applicable in this case because, unlike the SESCA, the SDMA does not contain an antipollution standard. Consequently, it is not within the exception created by MCL 324.1701(2). *Nemeth,* therefore, does not support the argument that a violation of the SDMA may serve as a prima facie violation of MEPA.

The Court of Appeals decision to the contrary was based on a misinterpretation of our holding in *Nemeth*:

> [A]lthough subsection 1701(2) speaks in terms of whether a "standard for pollution or antipollution device or procedure" exists, but does not specifically include whether a standard for impairment or destruction of a natural resources exists, our Supreme Court in *Nemeth* did not seem to find that to be an important point in that case in which soil erosion, rather than what is commonly thought of as pollution, was at issue. [253 Mich App 263, 286 n 2; 655 NW2d 263 (2002).]

The Court of Appeals conclusion is incorrect. In *Nemeth*, we expressly justified our holding in part because erosion *is* a form of pollution. *Nemeth, supra* at 27 ("Sedimentation and erosion is a [sic] well-recognized source of water pollution.").

Moreover, in *Nemeth*, as in all MEPA actions, the focus was on defendant's actual conduct.[5]    Specifically, this

---

[5] Although we held in *Nemeth* that the SESCA creates a pollution control standard applicable to MEPA claims, we also specifically stated:

> We emphasize that this is not the end of the inquiry. The trial court held that plaintiffs' showing of defendants' SESCA violations established a prima facie claim under the MEPA. Then, defendants had the opportunity to rebut that prima facie showing either by submitting evidence to the contrary, i.e., *that plaintiffs have shown neither pollution, impairment, nor destruction, nor the likelihood thereof, in spite of proof of the* SESCA *violations,* or by showing that there is no feasible and prudent alternative to defendants' conduct.    Subsection 1703(1). [*Nemeth* at 36 n 10 (emphasis added).]

Thus, it is clear that a defendant's opportunity to rebut a prima facie MEPA violation remains the same whether that violation has been established independently or by reference to another statute's pollution control standard, and that the determinative consideration is whether defendant's conduct will, in fact, pollute, impair, or destroy a natural resource.  In the instant case, the Court of Appeals erroneously concluded that § 63702 of the SDMA creates a pollution control standard and that defendant violated it.   Having so concluded, the Court of Appeals effectively concluded that defendant's violation of § 63702 amounted to a MEPA violation per se.  It failed to consider at all whether TechniSand had submitted evidence sufficient to rebut the alleged prima facie MEPA violations.   The trial court, however, *did* consider this evidence after finding that PTD presented a prima facie MEPA violation independent of the SDMA.   The trial court held that TechniSand had rebutted the prima facie MEPA violation. The Court of Appeals failure to consider whether TechniSand could rebut the (erroneously found) prima facie MEPA violation evidences the extent to which it improperly

Footnotes continued on following page.

11

Court reiterated in *Nemeth* the findings of fact required of a trial court as announced in *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975). In *Ray*, we stated:

> The trial judge must find the facts on which the plaintiff claims to have made a prima facie case under [§ 1703(1)], namely that *the defendant's conduct* "has, *or is likely* to pollute, impair or destroy the air, water or other natural resources." . . . Obviously the evidence necessary to constitute a prima facie showing will vary with the nature of the alleged environmental degradation involved. [*Ray* at 309 (some emphasis supplied).]

That the Court of Appeals failed to recognize that MEPA is concerned only with harmful conduct is readily apparent from its characterization of the circuit court's focus on TechniSand's mining conduct as error:

> Judge Schofield simply addressed whether TechniSand's proposed mining was likely to "pollute, impair, or destroy" the natural resource in this case— the critical dune area. [253 Mich App 286.]

Plaintiff and the dissent urge us to hold that although TechniSand's mining operation may or may not be likely to pollute, impair, or destroy the air, water, or other natural resources, its predecessor's allegedly deficient past relationship to the mining property negatively affects the environment. We decline their invitation to accept such fuzzy logic. Where a defendant's

---

failed to consider whether TechniSand's *conduct* would actually "pollute, impair, or destroy" a natural resource.

conduct itself does not offend MEPA, no MEPA violation exists.

D. Review of the DEQ's MCL 624.63702(1) Decisions[6]

We reject the dissent's gloomy prediction that this orderly understanding of MEPA "insulates [SDMA] permit eligibility determinations from judicial review." *Post* at 22.

As previously discussed, DEQ determinations of permit eligibility under §§ 63702(1) and 63704(2) are unrelated to whether the applicant's proposed activities on the property violate MEPA. Therefore, MEPA provides no private cause of action in circuit court for plaintiffs to challenge the DEQ's determinations of permit eligibility made under §§ 63702(1) and 63704(2).

An improper administrative decision, standing alone, does not harm the environment. Only wrongful conduct offends MEPA.

In general, judicial review of an administrative decision is available under the following statutory schemes: (1) the review process prescribed in the statute applicable to the particular agency, (2) an appeal to

---

[6] PTD does not challenge TechniSand's satisfaction of the requirements under § 63704(2).

13

circuit court pursuant to the Revised Judicature Act (RJA), MCL 600.631, and Michigan Court Rules 7.104(A), 7.101, and 7.103, or (3) the review provided in the Administrative Procedures Act (APA), MCL 24.201 *et seq.* *Palo Group Foster Care, Inc v Dep't of Social Services*, 228 Mich App 140, 145; 577 NW2d 200 (1998).

The SDMA does not expressly establish procedures for disputing a DEQ determination in a contested case unrelated to MEPA. We need not decide here whether PTD's challenge to the DEQ's permit decision is governed by the RJA or the APA because the challenge is time-barred under either statute. PTD brought this action nineteen months after the DEQ's decision to grant TechniSand's application for an amended permit, which far exceeds the sixty-day period allowed by the APA, MCL 24.304(1), and the twenty-one-day period provided by MCR 7.101(B)(1), which governs appeals under MCL 600.631 of the RJA pursuant to MCR 7.104(A). The DEQ and TechniSand properly interposed this defense in their initial pleadings. Thus, PTD's claim was time-barred.

### E. Participation and Intervention
### During The Permit Process Under the SDMA or MEPA

Parties who wish to intervene during the permit process have two options. They may intervene either under

14

the procedures governed by the SDMA or those governed by MEPA.

MCL 324.63708(5) of the SDMA establishes a procedure for notifying interested parties of permit applications:

> The department shall provide a list of all pending sand dune mining applications upon a request from a person. The list shall give the name and address of each applicant, the legal description of the lands included in the project, and a summary statement of the purpose of the application.

Thus, the SDMA provides a mechanism whereby interested parties may learn of and participate in agency decisions regarding approval of critical dune area mining permits.

MEPA provides another procedure for intervention in permit proceedings. MCL 324.1705(1). This statute requires a potential intervenor to file a pleading asserting that the proceeding or action for judicial review involves conduct that has violated, or is likely to violate, MEPA. Thus, while PTD could have intervened in TechniSand's permit process under MEPA, its only basis for intervention would have been TechniSand's proposed conduct. MEPA does not allow such intervention on the basis of anything other than alleged wrongful conduct.

F. Review of DEQ's MCL 324.63709 Determinations

As already discussed, a challenge under MEPA may be filed in circuit court before or during the time that the

alleged MEPA violation occurs, without any requirement that a litigant exhaust administrative remedies. Thus, whether TechniSand was ineligible for the permit under § 63709 on the basis of alleged harmful conduct was a question that was properly before the circuit court. The circuit court ruled against PTD.

The Court of Appeals has not reviewed the circuit court's decision that TechniSand's conduct did not violate the MEPA standard incorporated into the SDMA under § 63709. Because the Court of Appeals never reached PTD's claim that TechniSand's mining operation violates MEPA, that issue is not ripe for this Court's review. We remand the case to the Court of Appeals to review the circuit court's findings regarding TechniSand's sand mining activity. The Court of Appeals is directed to expedite its consideration of this case.

### F. Response to the Dissent

The dissent initially contends that it is undisputed that TechniSand is "ineligible for a permit." Post at 2. We disagree. The time for challenging TechniSand's eligibility for a permit is long past. TechniSand is lawfully entitled to mine sand dunes in Michigan according to the DEQ permit. Whether the DEQ's permitting decision was "unprincipled" or an "illegal about-face" is not a

16

determination for this Court to make. Post at 2.   That decision is time-barred.

The dissent further asserts that the DEQ's permit decision "*will* directly enable destruction of critical dunes." Post at 3-4 (emphasis supplied).   The dissent asserts that critical dunes will be destroyed because the Court of Appeals stated that TechniSand had acknowledged as much in an environmental impact statement.   The entire environmental impact statement is not in the record.[7] Moreover, the trial court expressly found to the contrary when it ruled on the MEPA claim.   It specifically held that TechniSand's mining would *not* destroy a critical dune. The Court of Appeals never addressed this finding.

The dissent's conclusion that the permitting process is subject to collateral attack is not defensible on the basis of MEPA's language, structure, or purpose.   Countless entities apply for and receive permits for conduct that affects Michigan's natural resources.   Under the dissent's

---

[7] The excerpt in the record indicates that TechniSand acknowledged that the project would "greatly alter" approximately 61% of the NSE.   In any case, the trial court expressly found more credible TechniSand's expert witnesses and ultimately held "the adverse impact on the environment caused by the mining as permitted will not rise to the level of impairment or destruction within the meaning of MEPA."

17

regime, the permitting decision can never be final.  Were we to adopt the dissent's extreme understanding of MEPA, every permit that has ever been issued would be subject to challenge; any undotted "i" or uncrossed "t" could potentially invalidate an existing permit.  We do not believe the Legislature intended MEPA to destabilize the state's permitting system in this manner.

Imagine the world that the dissent's reasoning would create.  The present energy crisis offers a good example.  For many years, our country has sought to decrease our reliance on foreign sources of oil.  Suppose an oil company decided to invest in oil exploration in Michigan in reliance on a DEQ-issued permit. Under the dissent's view, MEPA would authorize a challenge at any time to flaws in the permitting process.  Moreover, under the dissent's reasoning, a court must accept as true the bare assertion that a company's conduct will destroy natural resources. It can never rely on a permit to do business.  What sane investor would take such a risk?  As gas prices soar, few people in Michigan would thank this Court for "protecting" the environment in this radical fashion.

The dissent's regime would render the permitting process a useless exercise. It would cripple economic expansion in Michigan and probably lead to disinvestment.

No one would invest money to obtain a permit that is subject to endless collateral attacks.

MEPA nowhere strips the permitting process of finality. It is the dissent that makes a mockery of legislative intent by failing to anchor its exaggerated claims in the statute's actual language. See post at 3. MEPA does not impose the radical requirement that courts indefinitely police administrative agencies' permit procedures and decisions. As noted in *Oscoda Chapter of PBB Action Comm, Inc v Dep't of Natural Resources*, 403 Mich 215, 232-233; 248 NW2d 240 (opinion by Levin, J.) (1978):

> A court is not empowered to prevent any conduct . . . which does not rise to the level of environmental risk proscribed by [MEPA]. The standard, 'has or is likely to pollute, impair or destroy,' is a limitation as well as a grant of power.

Moreover, the Court of Appeals never reached the issue of whether TechniSand's actual conduct is likely to harm natural resources. As already noted, the trial court specifically held that TechniSand's conduct did not violate MEPA. Given this procedural posture, we are puzzled by the dissent's statement that defendant's mining "will" destroy critical dunes.

After taking extensive testimony on the issue, the trial court ruled that any "adverse impact on the

19

environment caused by the mining as permitted will not rise to the level of impairment or destruction within the meaning of MEPA." The Court of Appeals did not explicitly reject the trial court's findings. Instead, it erroneously concluded that a permit that affects the environment in any way may be challenged at any time under MEPA. For the reasons articulated above, the Court of Appeals erred in interpreting MEPA in this manner.

CONCLUSION

MEPA affords no basis for judicial review of agency decisions under MCL 324.63702(1) because that inquiry is outside the purview of MEPA. The focus of MEPA is to protect our state's natural resources from harmful conduct. It offers no basis for invalidating an issued permit for reasons unrelated to the permit holder's conduct. To hold otherwise would broaden by judicial fiat the scope of MEPA and create a cause of action that has no basis in MEPA's language or structure.

The Court of Appeals erred by treating PTD's challenge to TechniSand's eligibility for a permit under MCL 324.63702(1) as a MEPA claim. Because PTD brought its claim more than nineteen months after the DEQ issued the permit, PTD's claim is time-barred. We reverse the decision of the Court of Appeals on that issue.

We remand the case to the Court of Appeals to review the circuit court's findings that TechniSand's mining conduct does not violate MEPA, and direct the Court of Appeals to expedite its review.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PRESERVE THE DUNES, INC,

     Plaintiff-Appellee,

v                                                            No. 122611

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

     Defendant,

and

TECHNISAND, INC,

     Defendant-Appellant.

_____

PRESERVE THE DUNES, INC,

     Plaintiff-Appellee,

v                                                            No. 122612

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

     Defendant-Appellant,

and

TECHNISAND, INC,

     Defendant.

_____

KELLY, J. (*dissenting*).

In 1995, the Michigan Department of Natural Resources (DNR) denied defendant TechniSand permission to mine critical dunes because it was ineligible for a permit under the sand dune mining act[1] (SDMA), MCL 324.63701 *et seq.* One year later, following Governor Engler's reorganization of the DNR, the newly created Department of Environmental Quality (DEQ) invited TechniSand to apply again, citing "changes in state government." TechniSand reapplied and the DEQ granted a permit despite the fact, now undisputed, that TechniSand remained ineligible to mine critical dunes. As a result, critical dunes that would otherwise remain untouched will be impaired and perhaps destroyed.

Through the decision in this case, a court majority of four sanctions the DEQ's unexplained and illegal about-face on TechniSand's critical dune mining permit. In the process, it strikes a devastating blow to Michigan's environmental law.[2] This majority perpetuates the DEQ's

---

[1] The Sand Dune Mining Act is codified as part 637 of the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.*

[2] The majority's decision to significantly narrow the scope of the applicability of the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.,* in this case is compounded by its recent decision in *Nat'l Wildlife Federation & Upper Peninsula Environmental Council v Cleveland Cliffs Iron Co and Michigan Dep't of* Footnotes continued on following page.

unprincipled decision to permit illegal mining of critical dunes by insulating it from the scrutiny of the Michigan environmental protection act (MEPA).  MCL 324.1701 *et seq.* Its holding that the DEQ's decision to grant the permit to mine critical dunes is "unrelated to" the destruction of those critical dunes defies reality.  It mocks our Legislature's intent to prevent environmental harm.  In addition, it is contrary to this Court's earlier MEPA decisions.[3]

Critical sand dunes, like those at issue in this case, are specially protected natural resources.  The mining act protects these irreplaceable resources by strictly limiting who is eligible to mine them.  MEPA works in tandem with the mining act to, in its own words, supplement "existing administrative and regulatory procedures provided by law."  MCL 324.1706.  Issuance of the permit will directly enable

---

*Environmental Quality*, 471 Mich ___ ; ___ NW2d ___ (2004). There, the same majority ignores thirty years of precedent and applies judge-created standing tests to MEPA plaintiffs.  It makes this ruling despite the fact that the statute explicitly grants standing to "any person" to maintain an action to prevent pollution, impairment, or destruction of our natural resources.  MCL 324.1701(1).

[3] See e.g., *Eyde v Michigan*, 393 Mich 453, 454; 225 NW2d 1 (1975), *Ray v Mason Co Drain Comm'r* 393 Mich 294, 304-305; 224 NW2d 883 (1975), *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 751; 275 NW2d 538 (1979) (WMEAC), and *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16; 576 NW2d 641 (1998).

destruction of critical dunes that would otherwise remain untouched. Hence, it is inescapable that the DEQ's decision to issue the permit may be challenged under the environmental protection act.

Moreover, the environmental protection act does not impose a statutory period of limitations on legal actions that assert that a party's conduct will cause environmental pollution, impairment, or destruction. Therefore, I would hold that plaintiff's challenge is not limited by the statutory period of either the Administrative Procedures Act (APA) or the Revised Judicature Act (RJA). MCL 24.201 *et seq.*, MCL 600.101 *et seq.*

I dissent because the majority's decision subverts the purposes of the sand dunes mining act and the environmental protection act by incorrectly insulating the DEQ's permit decision from scrutiny under the environmental protection act. Defendant TechniSand is not eligible for a permit to mine critical dunes sand under the sand dunes mining act. Accordingly, I would affirm the decision of the Court of Appeals.

## The Majority's Response to the Dissent

The majority's "Response to the Dissent"[4] is an abrupt departure from its precedent of declining to amend legislative policy decisions with which it disagrees.[5] Its discussion of the wisdom of the Legislature's decision to bar sand dune mining by anyone who does not meet limited eligibility criteria is unsuited for a judicial opinion. Moreover, the majority's comparison of the eligibility problem in the permit to a clerical error and its suggestion that my position would allow endless challenges for such trifles are gross exaggerations. *Ante* at 17-18. Granting a permit to mine critical dunes to an ineligible operator is a substantive fault. It is a violation of the law that allows conduct likely to pollute, impair, or destroy a natural resource specially protected by the Legislature. Economic development in this state has not ceased in the past thirty years. It will not now grind to a halt under the oppressive weight of permit challenges if

---

[4] *Ante* at 16-20.

[5] This Court has scrupulously declined to consider the wisdom of the Legislature's policy decision. See e.g. *Oakland Co Rd Commr's v Michigan Prop & Cas Guaranty Ass'n*, 456 Mich 590, 612-613; 575 NW2d 751 (1998).

this Court reaffirms its prior holdings that MEPA allows challenges to environmentally destructive permit decisions.

## Facts and Proceedings Below

Defendant TechniSand purchased real property in 1991 that included both critical and noncritical dune areas. Along with its purchase, it obtained a permit to mine sand in noncritical dune areas on one portion of the property. In 1994, TechniSand applied for an amendment of this permit to expand sand dune mining to critical dune areas on an adjacent portion of the property.

The Michigan Department of Natural Resources, the agency charged with reviewing SDMA permit applications at the time, denied the application on the ground that TechniSand was ineligible for an amended permit. The original permit was to mine in noncritical dune areas and did not include the property's critical dune areas. Also, TechniSand had purchased the land and mining operation after the deadline to apply for an unassociated permit to mine the critical dune areas. MCL 324.63702(1)(b).

In 1995, Governor John Engler created a new agency, the Michigan Department of Environmental Quality (DEQ). Executive Reorganization Order No. 1995-16 (codified at MCL 324.99903). The DEQ was given responsibility for administering the SDMA and other environmental permitting

6

programs, and the Governor appointed its director. The DEQ then wrote to TechniSand indicating that "changes in state government" and "additional information" from TechniSand would allow the DEQ to review the permit application.[6]

TechniSand resubmitted the environmental impact statement and reclamation plan that it had submitted with its previous application, without providing additional information demonstrating how it was eligible for an amended permit. The DEQ issued the permit later that year. It did not explain how TechniSand met the eligibility criteria in the SDMA. Also, it does not now dispute that TechniSand is ineligible for a permit.

Plaintiff Preserve the Dunes was formed in 1996. In 1998, it sued TechniSand and the DEQ for injunctive relief to stop TechniSand's mine expansion. Plaintiff alleged that TechniSand was ineligible for an SDMA permit and that its mine expansion violated MEPA.

The trial court ruled that plaintiff's challenge to the permitting decision was time-barred under the

---

[6] Letter dated April 1, 1996 from Douglas Daniels and Kimberly Rice of the DEQ. The letter makes reference to an April 20, 1995, letter by which Roger Whitener of the DNR informed TechniSand that, pursuant to an opinion of the state attorney general, TechniSand was ineligible to mine critical dunes. The April 1, 1996, letter did not address TechniSand's ineligibility to mine critical dunes.

Administrative Procedures Act and that the environmental impact of the mining was insufficient to implicate MEPA. The Court of Appeals reversed the ruling. 253 Mich App 263; 655 NW2d 263 (2002). It held that the DEQ's decision to grant TechniSand's amended permit could be challenged under MEPA and that TechniSand did not qualify for a permit under § 63702 of the SDMA. The DEQ's decision to amend TechniSand's permit, it concluded, violated MEPA.

The Court of Appeals remanded the case to the trial court for entry of summary disposition for plaintiff. Because it had found TechniSand ineligible for a permit to mine the critical dune area, it did not review the trial court's finding that the mining itself violated MEPA. This Court granted the applications for leave to appeal filed by the DEQ and TechniSand. 468 Mich 869 (2003).

### The Sand Dune Mining Act Protects Michigan's Critical Dunes from Destruction

It is without contest that the Legislature enacted the sand dune mining act to stringently protect Michigan's sand dune areas from further destruction. They are one of the state's prized natural resources. The Legislature included in the act special provisions to preserve dune areas it labeled "critical."

It expressly indicated:

> The critical dune areas of this state are a unique, irreplaceable, and fragile resource that provide significant recreational, economic, scientific, geological, scenic, botanical, educational, agricultural, and ecological benefits to the people of this state and the people from other states and countries who visit this resource. [MCL 324.35302(a).]

The Legislature enacted the SDMA out of concern that mining the dunes consumes them and harms the environment. The act is an expression of the state's "paramount" interest in protecting the dunes. See MCL 324.1701. It defines "Sand dune mining" as the "removal of sand from sand dune areas for commercial or industrial purposes." MCL 324.63701(l).[7] It requires all persons seeking to mine sand dunes to obtain a sand dune mining permit. MCL 324.63704. Regarding critical dunes, the act states that "the removal of any volume of sand that is not sand dune mining within a critical dune area as defined in part 353 is subject to the critical dune protection provisions of part 353." MCL 324.63701(l).

---

[7] The statute exempts from this definition the removal of "volumes of less than 3,000 tons" of sand if the removal is a "1-time occurrence and the reason the sand is removed is not for the direct use for an industrial or commercial purpose."

9

The SDMA's flat prohibition against mining any sand in designated critical sand dune areas is subject only to a narrow exception. That is, authorized mining entities that existed when the SDMA was enacted may continue operation (1) on land in which they had a mining interest before July 5, 1989 or (2) on land adjacent to property in which they had a mining interest before that date. MCL 324.63702(1).[8]

These "grandfathering" exceptions reflect the Legislature's attempt to balance mining interests that predated the critical dune designation of July 5, 1989, with the preservation of the remaining and newly designated

---

[8] MCL 324.62702(1) provides in full:

Notwithstanding any other provision of this part, the department shall not issue a sand dune mining permit within a critical dune area as defined in part 353 after July 5, 1989, except under either of the following circumstances:

(a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5, 1989, subject to the criteria and standards applicable to a renewal or amendatory application.

(b) The operator holds a sand dune mining permit issued pursuant to section 63704 and is seeking to amend the mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989 the operator owned the land or owned the rights to mine dune sand in the land for which the operator seeks the amended permit.

10

critical dunes. New entities would be unable to begin operation. Existing entities would have limited opportunities to mine additional areas. By limiting critical dune mining to those entities with a preexisting interest, existing entities would be allowed to continue operating while ensuring that mining would not last indefinitely.

The Legislature mandated that these narrow exceptions for sand dune mining would be implemented through regulatory permits. MCL 324.63704. The act created a permitting procedure to ensure that future mining would be only by parties with a pre-existing legal interest, and in a manner protective of critical dune areas. It cannot reasonably be suggested that the eligibility criteria that completely prohibit all but an expressly defined few operators from mining critical dunes are not a measure of environmental protection.

Only if eligibility is verified do additional environmental protections come into play. Permit applications by eligible entities are reviewed on a case-by-case basis to ensure that the proposed mining is environmentally acceptable. The applicant must submit an environmental impact statement describing the anticipated environmental damage that will occur from the mining

11

operation. MCL 324.63704(2)(b). The applicant must explain why alternative mining locations were not chosen. MCL 324.63705(h). It must include a reclamation plan for the area to be mined. MCL 324.63704(2)(c), 324.63706.

In reviewing the application, the DEQ must ensure that the proposed mining is unlikely to pollute, impair, or destroy natural resources or the public trust in those resources. MCL 324.63709. Any permit issued must require that the provisions of the applicant's progressive cell-unit mining and reclamation plan are met. MCL 324.63706(3). If threatened or endangered species are present, the plan must include provisions either to protect them or to mitigate the effect of mining on them. MCL 324.63706(3)(g).

### Plaintiffs May Challenge the Permit Eligibility Determination Under the Michigan Environmental Protection Act

The environmental protection act provides that

> . . . any person may maintain an action in the circuit court . . . where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. [MCL 324.1701(1).]

Under this act, a plaintiff makes a prima facie case by showing "that the conduct of defendant is likely to

12

. . . destroy the . . . natural resources or the public trust in these resources." MCL 324.1703(1).[9] The Legislature expressly provided that MEPA supplements existing regulatory procedures that were provided by law. MCL 324.1706.

The SDMA's eligibility restrictions protect critical dunes from mining by ineligible operators whose conduct is likely to impair or destroy critical dunes that would otherwise remain untouched. Hence, the environmental protection act is applicable to decisions regarding an SDMA permit applicant's eligibility. The SDMA specifically incorporates the Legislature's recognition that critical dunes are "irreplaceable" natural resources. MCL 324.35302(a). It provides that "the removal of any volume of sand . . . within a critical dune area . . . is subject to the critical dune protection provisions of part 353." MCL 324.63701(l). Its provisions strictly limiting eligibility to mine critical dunes are intended to help protect critical dunes from pollution, impairment, or destruction.

---

[9] The majority's reference to MCL 324.1702(2) is misplaced. *Ante* at 10. Plaintiffs are not challenging the DEQ's imposition on Technisand of the SDMA's pollution control standards. They do not challenge the manner in which permissible activity is undertaken. They challenge whether Technisand's conduct is permissible at all.

Thus, the majority's suggestion that permit eligibility is unrelated to whether the conduct permitted will harm the environment is untenable. Issuance of a permit to an ineligible operator to engage in any mining of critical dunes will allow "conduct . . . likely to pollute, impair, or destroy . . . natural resources or the public trust in these resources." MCL 324.1703(1); see also *West Michigan Environmental Action Council v Natural Resources Comm,* 405 Mich 741, 751; 275 NW2d 538 (1979) *(WMEAC).*

MEPA is intended to prevent conduct that is likely to harm the environment as well as to stop conduct that is presently harming it. In *WMEAC,* this Court ordered that a permanent injunction be entered prohibiting the drilling of oil and gas wells pursuant to a DNR permit. The "issuance of permits was properly before the circuit court as conduct alleged to be likely to pollute, impair, or destroy" natural resources under MEPA. *WMEAC* at 751. The drilling would cause "apparently serious and lasting, though unquantifiable, damage" to elk herd population. *WMEAC* at 760. This Court concluded that the previous MEPA, MCL 691.1203(1), is violated whenever the effects of permit issuance harm the environment to the requisite degree. *WMEAC* at 751, 760.

Unlike permit eligibility for fossil fuel drilling and other activities that may pollute the environment if done improperly,[10] SDMA permit eligibility is severely restricted. The applicant must demonstrate a preexisting mining interest, and no mining may occur until this requirement has been satisfied. It reflects the Legislature's premise that the removal of even one bucket of sand from a critical dune *by an ineligible operator* will inordinately impair the state's critical dune areas. An action that enables such conduct may be challenged as destruction or impairment under MEPA.

This Court observed in *Nemeth*[11] that a violation of a permitting procedure can support a prima facie claim under MEPA. A "plaintiff's prima facie case is 'not restricted to actual environmental degradation but also encompasses probable damage to the environment as well.'" *Nemeth, supra* at 25, quoting *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 309; 224 NW2d 883 (1975). In the soil erosion and

---

[10] See also MCL 324.5505 and 324.3106, requiring permits for activities that may pollute the air and water without imposing stringent eligibility criteria.

[11] See n 3.

15

sedimentation control act,[12] the Legislature created a pollution control standard that this Court held could be enforced through MEPA. *Nemeth*, supra at 35.

The Legislature chose to make the SDMA more protective of the environment than the soil erosion and sedimentation control act. As already explained,[13] the Legislature determined that any mining of critical dunes by ineligible entities is an unacceptable destruction of this natural resource. Hence, the majority's conclusion that eligibility is unrelated to conduct is premised on an artificial and hypertechnical bifurcation of the permitting process. When concluding that permit eligibility is unrelated to conduct, the majority buries its head in the sand.

Its characterization of the eligibility review as an "initial inquiry"[14] is not based on the language of the statute. The eligibility criteria in MCL 324.63702 are as much a condition to engage in critical sand dune mining as the requirements in §§ 63704 through 63706. The SDMA does not enact a hierarchy or order to be followed by those

---

[12] MCL 324.9101 *et seq*.

[13] *Supra* beginning at 7.

[14] *Ante* at 7.

16

reviewing a permit application. Unlike this Court's recent decision in *Nemeth,* here the majority reads "likely to" out of the statute.

The majority argues that an inquiry into the effect on the environment of the proposed mining "would be pointless unless the DEQ first determined that the applicant was eligible for a permit on the basis of the applicant's status". *Ante* at 7-8. We could not agree more. It would be pointless for the DEQ to review the effect of the proposed mining if the applicant were ineligible for a permit. If the applicant is not eligible, no mining will occur. Critical dunes will not be destroyed.

The majority attempts to restrict the inquiry into Technisand's conduct to consideration of the nature of its relationship to the property at issue. This is misleading.[15] The conduct in question is more than TechniSand's "relationship to the mining property." It necessarily encompasses TechniSand's proposal to remove large quantities of sand from designated critical dunes that would otherwise remain untouched. This is the "actual

---

[15] See, e.g., *ante* at 11 n 5. The majority's implicit recognition that [c]ountless entities apply for and receive permits for conduct that affects Michigan's natural resources," *ante* at 17, demonstrates the internal inconsistency of its argument.

17

conduct" that the permit at issue allows and that plaintiff alleges is "likely to pollute, impair, or destroy" critical dunes under MEPA. MCL 324.1703(1). Because the critical dunes could not have been mined by TechniSand at all without the erroneous eligibility determination, plaintiff should be allowed to pursue its MEPA cause of action.

Statutory provisions must be read in the context of the entire act so as to produce a harmonious whole. *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 159; 627 NW2d 247 (2001). Subsections a and b of § 63702(1) must be read together because of their juxtaposition. Subsection b applies when the permit holder seeks to expand the permit to include adjacent land that contains a critical dune area that it owned before July 5, 1989. In contrast, subsection a applies to the amendment or renewal of a permit that already authorizes mining in a particular area.

The permit issued to TechniSand authorized mining only in the noncritical dune areas. TechniSand had to apply for a permit amendment to add the adjacent critical dune areas to its permit. Therefore, subsection b applies to this case. However, TechniSand did not own the land or the rights to mine the sand before 1989 as required by the statute. Therefore, it could not have obtained the permit

18

amendment and could not have engaged in any critical sand dune mining.

TechniSand's environmental impact statement[16] acknowledged that mining the critical dunes at issue would "significantly impair the environment and would permanently destroy critical dune." 253 Mich App 269. Witnesses testified from the statement that the mining will change "the nature of the result in the environment . . . for hundreds of years"[17] and a "large percent of the critical dune will be removed."[18] Plaintiff's expert testified that "The critical dune will be gone."[19]

Nonetheless, the majority holds that the DEQ's determination that TechniSand is eligible to mine critical dunes is unrelated to whether TechniSand's mining activities will pollute, impair, or destroy a natural

---

[16] The majority criticizes me for citing a document "not in the record." *Ante* at 17. However, it was Exhibit 21 at trial, and witnesses read from it. See Trial Tr at 122, 582, 785, and 932. Plaintiff's brief on appeal in the Court of Appeals quoted it at p 6. The record on appeal includes all original papers filed in the courts below. MCR 7.311(A). Plaintiff included an excerpt in the appendix (p 14b) to its brief on oral argument before this Court. See MCR 7.308.

[17] Trial Tr at 935.

[18] *Id.* at 785.

[19] *Id.* at 122.

19

resource. Thus, it concludes that plaintiff cannot rely on MEPA to challenge the permit that has been issued. The majority's reasoning undermines the critical dunes protections in the SDMA, the intent of MEPA, and this Court's earlier MEPA decisions.

Plaintiff is not required to challenge issuance of the permit as an administrative decision under either the Administrative Procedures Act (APA) or the Revised Judicature Act (RJA). The MEPA is "supplementary to existing administrative and regulatory procedures provided by law." MCL 324.1706. It was intended to create a common law of environmental protection. *Ray* at 306. It does not require that a plaintiff exhaust administrative remedies. MCL 324.1701(1). Accordingly, the statutory period of limitations of neither the APA nor the RJA apply to plaintiff's MEPA claim.[20] Plaintiff's challenge to Technisand's permit under the MEPA is not time-barred.

The DEQ does not dispute that TechniSand is ineligible for a permit. Recognizing plaintiff's claim under the

---

[20] The MEPA itself imposes no statutory period of limitations, but equitable claims under the Natural Resources and Environmental Protection Act, which houses MEPA, have been held subject to the six-year statutory period of MCL 600.5813. *Attorney General v Harkins*, 257 Mich App 564, 571; 669 NW2d 296 (2003).

environmental protection act expresses no disrespect for an administrative agency's decision. The majority abdicates its responsibility by refusing to review this permit eligibility determination under MEPA.[21]

## Conclusion

The majority's decision today wrongly insulates Sand Dune Mining Act permit eligibility determinations from judicial review. The decision to issue a sand dune mining permit pursuant to the SDMA inherently includes an environmental component. I would hold that issuance of the permit in this case can be challenged under the Michigan environmental protection act.

The Legislature intended the act to apply to permit determinations. Application of the act to permit determinations is entirely consistent with the Legislature's intent to stringently preserve Great Lakes sand dunes against degradation and to protect the integrity

---

[21] The majority cites *Oscoda Chapter of PBB Action Comm, Inc v Dep't of Natural Resources*, 403 Mich 215, 233; 268 NW2d 240 (1978) to support its finality argument. But its quotation from the case is taken out of context and is from an opinion that did not garner a majority of votes. The statement addressed the court's authority to consider feasible and prudent alternatives to proposed conduct, an issue entirely unrelated to the majority's decision that this permit challenge under MEPA is time-barred.

of that environment.  The majority's reasoning frustrates that intent.

Plaintiff's cause is not barred by the statutory limitations periods of the APA and the RJA.  The Court of Appeals correctly remanded the case for entry of an order granting summary disposition for plaintiff.  Its decision should be affirmed.

Because the majority ignores both the reality of the permitting process and the Legislature's intent to protect critical dune areas from destruction, I must dissent.

Marilyn Kelly
Michael F. Cavanagh
Elizabeth A. Weaver

22